Illinois Broadcasting Company, a Corporation, Plaintiff-Appellant, v. City of Decatur, a Municipal Corporation, and General Electric Cablevision Corporation, Defendants-Appellees.

**Gen. No. 10,890.**

Fourth Division.

June 12, 1968.

Robert D. Owen and Edward Booth, Greanias & Owen, of Decatur, for appellant.

Hilmer C. Landholt, Corporation Counsel, of Decatur, and Samuels, Miller, Schroeder, Jackson & Sly, of Decatur (Thomas W. Samuels and E. W. Schroeder, of counsel), for appellees.

SMITH, P. J.

Some city ordinances involving community antenna television—CATV—are here for review. The attack upon their validity has been repelled. Proponent is defendant, General Electric Cablevision Corporation (General) and contestant is plaintiff, Illinois Broadcasting Company (Illinois), who effects this appeal. One of the ordinances grants or permits General to use the streets, alleys, etc. for CATV purposes—"the franchise ordinance"; a second, characterized as the "specifications ordinance," sets forth technical criteria relative to such; and a third, the "criminal ordinance" precludes use of the streets, alleys, etc. by anyone not having a CATV franchise, and, indeed, one passage specifically forbade persons from engaging in the

CATV business without a license. This latter provision has been repealed, and our consideration subsumes this excision.

 Illinois' standing with regard to the criminal ordinance is questionable, as it does not appear that the ordinance will impinge, mediately or immediately, on its principal activity—broadcasting—nor does it appear that there is any real threat that some peripheral activities—a mobile trailer—is within the ban, though if the trailer is really "mobile" it might be considered to be literally proscribed. But we shun so strict a reading, and in any event, its implementation vis a vis Illinois is neither present nor imminent. Ordinances like statutes should be given a reasonable construction and we conclude at best that Illinois' standing to attack this ordinance is hazy. Accordingly, the dismissal of the counts apropos of the criminal ordinance is affirmed.

We can quickly dispose of the specifications ordinance. If the franchise ordinance is valid then it is too, because the franchise ordinance incorporates the specifications ordinance by reference. As its title implies, and as we have said, it sets forth minimum specifications for the construction and operation of CATV systems, and our perusal of it confirms just that—they seem to be all there.

The "franchise ordinance" grants to General the right, privilege, permission and authority to construct, erect, operate and maintain upon, along, across, above, over and under the streets, alleys and public ways, poles, wires, cables, conduits and other fixtures and to use the same for the purpose of transmitting television signals and "especially for the conduct of a community antenna television system, for the reception, sale, and distribution of television signals." The right granted is "nonexclusive," and the city reserves the right to grant similar rights to others. General is to pay $10,000 per year, or 6% of annual gross receipts, whichever is greater; to

furnish without charge a connection or "(drop)" to each of the public and parochial schools; to each building of an existing university or any junior college in the future; and to such city buildings as the Council may from time to time direct; in addition, the schools are to receive, without charge, for use in distributing educations programs, a video tape playback machine and "necessary equipment"; to provide a system of not less than twelve channel capability; one such channel is to be used exclusively for the distribution of educational programs, and another is to be open from 8:00 a. m. to 4:00 p. m. for the use of the schools, but if not needed, "a cultural program may be substituted if available." There is to be no discrimination between persons or between areas in the city and the system is to operate 24 hours a day, and within three years General is to have extended full service and access into every area, and "to every applicant for service in all parts and areas" of the city. New areas are to be fully serviced within two years from date of annexation. The ordinance ordains that General is to be law abiding, and not engage in any business competitive with renting, repairing, selling, or "installing television devices, or sets, antennae, radios or other electronic devices." It is forbidden to recommend persons engaged in renting, repairing, etc., and it is to refrain from installing equipment for the reception of its services in exchange for removal of then existing television or radio installations or any part thereof, and General "shall discourage others from so doing" by including within its rules "denial of service, or otherwise." General is to maintain an office in the city, not interfere with others in "the direct broadcast or reception of other signals," and, as we have pointed out, conform with the specifications ordinance and with changes that time might bring, "to reflect improvements in the art." In erecting poles "conductors, conduits and apparatus," General is to do so in a way that it will not interfere unnecessarily with

travel "on such streets, alleys, avenues, bridges or other public places, and shall be erected and placed under supervision." There is a lengthy section as to poles, smacking of the specifications ordinance, and no poles are to be erected where an existent utility company has none. When the city improves its streets, avenues, alleys, etc., General is to accommodate the city, and while construction is under way, there is even a provision that any obstruction or opening "during periods of dusk and darkness shall be clearly designated by warning lights." General is to have the authority to promulgate reasonable rules and regulations, but such are not to be in conflict with any future "federal, state or city law, ordinance, rule or regulation." Charges are to be uniform and no discrimination is to exist between persons, firms or corporations for the same or similar services. The rates are then scheduled. Increases can be had, but only with permission of the city, and the parties and General are to "reasonably and in good faith endeavor to reach agreement." General is to comply with the provisions of the Fair Employment Practices Act and shall "otherwise refrain from any discrimination between persons by reason of race, color, creed or national origin, either in the employment of persons or the furnishing of services, or otherwise." A bond ($50,000) is required subject to forfeiture if General "fails to perform in accordance with any of the provisions of this ordinance," and upon cessation of operations, "all poles, wires, cables, towers, facilities, equipment and appurtenances shall be removed." The grant of the right or privilege "permission and authority" to General shall continue for fifteen years, "provided the company shall within thirty days after the passage of this ordinance file with the City Clerk its unconditional acceptance of the terms hereof in writing" and should General fail to file such acceptance, "then it shall be deemed a rejection hereof, and the rights, privilege, per-

mission and authority herein granted shall immediately terminate and cease."

■ General did file its acceptance in time and the ordinance thus became effective, assuming its initial validity, which is one of the things we are asked to decide. Of course, the "criminal" ordinance needed no acceptance as it had general applicability and therein lies a distinction of sorts. The specifications ordinance, while general too, only has applicability to those who have a franchise, and is thus quite different. As with the criminal ordinance, a preliminary question is Illinois' standing to sue. It seems clear to us that Illinois does have standing. For one thing, public moneys would necessarily have to be spent to enforce, or rather, are involved in implementing this ordinance, and that being so, and Illinois being a taxpayer, it can at least get into court to question validity. Nordine v. Illinois Power Co., 48 Ill App2d 424, 199 NE2d 34.

■ At the time this ordinance was enacted there was no statutory authority which expressly dealt with the licensing or franchising of the business of CATV by municipalities. However during the pendency of this appeal, the following was enacted, being § 11–42–11 of chapter 24, Ill Rev Stats 1967:

> "The corporate authorities of each municipality may license, franchise and tax the business of operating a community antenna television system as hereinafter defined."

Notwithstanding this express grant, and without getting into the question of whether this section would validate an extant ordinance otherwise invalid, we are of the opinion that municipalities prior to the passage of this section had implied power in the very first instance to enact the franchise ordinance under attack. But the power to enact must be carefully distinguished from some of

459

the conditions here imposed, as to which municipalities have no power to exact unless such exaction is agreed to.

Whence came this power of Decatur's to enfranchise General. The power finds its source in the statutory grant permitting municipalities to regulate the use to be made of their streets, alleys and public ways—"over, above, beneath and across." A parallel power with somewhat reverse English grants to cities the right to prevent obstructions. Specifically, § 11–80–2 of the Illinois Municipal Code (c 24, Ill Rev Stats 1965) accords to cities the right to regulate the use of its streets and other municipal property, and § 11–80–3 says that the "corporate authorities of each municipality may prevent and remove encroachments or obstructions upon the streets and other municipal property." Curbs, gutters and crosswalks are provided for in § 11–80–11, and the space over the streets and public places in § 11–80–8. These are the sources from which Decatur derives the power to enact this ordinance.

■■ A business whose product must travel by wire from house to house has to first obtain some type of permission from the city concerned, as wires cannot be strung from house to house without in some way making use of the streets and alleys—"over, above, beneath and across." As we have seen, the franchise ordinance circumscribes with particularity this use, to the end of incurring a minimum of inconvenience to the public and a maximum of safety. If this is done and the use is reasonable, private use of streets is permissible. Withers v. City of Granite City, 23 Ill2d 156, 177 NE2d 181. There it was stated that the test of what use can be permitted upon or under the streets is measured by whether or not the encroachment is reasonable and in the public interest. In Sears v. City of Chicago, 247 Ill 204, 93 NE 158, it was said in this regard there is no limitation upon the power of a municipality except "that its exercise shall be reasonable and in a manner to safeguard the paramount

right of the public to the free and unobstructed use of the streets." Certainly the use here contemplated meets this test. If this is so then Decatur has the right to attach—but not impose or exact—conditions to such use, though unrelated to it, leaving it up to the person seeking the grant to either accept or reject them. Cast in this mold the ordinance becomes effective only upon acceptance. Rejection, and the ordinance is a dead letter. We see nothing wrong in the city saying in effect: You may use our streets for such and such a purpose as such purpose is reasonable and in the public interest yet before we will grant you this, you must in turn agree to certain conditions collateral to the specific use you desire.

That some of the conditions present here in the franchise ordinance and indubitably in the specifications ordinance do constitute regulation unrelated to use of the streets is to state the obvious. A quick perusal discloses that a great many are concerned solely with CATV aspects. However, these conditions are self-imposed. They are not imposed by Decatur. If General agrees to be so regulated who can complain? If General accepts a condition to pay a given sum who cares, and if General pays, as we assume it will, who is hurt? If General discovers later on that some of the conditions it agreed to are onerous, it can assuage itself with the thought that surcease is but fifteen years away—a condition, too, it agreed to.

That ordinances of this kind find currency is best exemplified in City of Peoria v. Peoria Transit Lines, 11 Ill2d 520, 144 NE2d 609. This case involved a grant by Peoria to Transit to use the streets for purposes of operating a bus system, the ordinance providing that Transit should pay to Peoria a percentage of gross revenues. Transit agreed to do just that and when it reneged, Peoria sued. In defense, Transit attacked the validity of the ordinance, arguing that it could not be sustained under either Peoria's regulatory or taxing powers. While the Court

461

found it unnecessary to consider or to discuss the validity of the ordinance as a revenue measure, in holding that such ordinance was a valid exercise of the City's regulatory powers, particularly under its authority "to regulate the use of the streets," it did go on to say, "in any case the amount charged was that to which the defendant had agreed." Apropos of some cases cited by Transit as authority for the proposition that a city lacks power to require a franchisee to pay a percentage of gross receipts, such were distinguished thusly: "Neither of those cases involved a franchise ordinance that had been accepted by the utility."

Regardless of what might now be Decatur's rights under the new CATV section to tax the business of CATV, the quid pro quo here, or whatever we call it, is certainly not a tax because a tax however welcome (if there is any such thing) does not take its being via agreement. Taxes are imposed not self-imposed. Taxes are imposts. No agreement is necessary to collect an impost from an impostee. Here, again, what General has to pay, General has agreed to, and if General can agree to this condition, we see no reason why it cannot agree to the others. Of course, nobody can agree to conditions that are against public policy but none of these bear that stigma—nor, for that matter, is such urged. That Decatur could not have exacted many of these conditions is immaterial. Exactions agreed to, like impositions, are not exactions. Accordingly, we find this to be a valid ordinance and the order appealed from is affirmed.

Affirmed.

CRAVEN and TRAPP, JJ., concur.