**CABLEVISION, INC., Appellant,**

v.

**CITY OF SEDALIA, Missouri, Respondent.**

**No. 58280.**

Supreme Court of Missouri,
Division No. 1.

Dec. 16, 1974.

Motion for Rehearing or to Transfer to Court En Banc Denied Jan. 13, 1975.

---

James T. Buckley, Sedalia, for plaintiff-appellant, Cablevision, Inc.

J. R. Fritz, Sedalia, for defendant-respondent, City of Sedalia, Mo.

WELBORN, Commissioner.

Action to determine validity of city ordinance requiring approval by city council of increase in rates charged subscribers of cable television system. Action alternatively sought declaration that refusal of approval of proposed increase was arbitrary and unlawful. Trial court upheld validity of ordinance and action of council in refusing approval of proposed rate increase. Plaintiff appeals.

Prior to May 17, 1965, five applicants submitted to the City of Sedalia requests for the grant of a permit to construct and operate a community antenna television system in Sedalia. One applicant was Cable TV Construction, Inc., a Kansas corporation. Its application proposed the formation of a Missouri corporation, Sedalia Cable TV, Inc., to construct and operate the system. The application outlined the service proposed to be offered and the plans for necessary construction to provide such service. The application included the following:

"Sedalia Cable T.V., Inc. suggests, subject to the approval of the City of Sedalia,

**50**

the monthly service rate be $4.50 with no installation charge."

The proposal included an offer to pay a 10% annual gross receipts tax to the city, with a $5,000 per year guarantee.

On May 24, 1965, the Sedalia City Council enacted Ordinance No. 6355, which had been prepared by Cable TV Construction, Inc. The ordinance granted Cable TV a "non-exclusive right to construct and operate a community antenna and closed-circuit electronic system within the city of Sedalia, * * *." The ordinance granted Cable TV the right "to use and occupy the streets, alleys and other public places within the city for placement of wires, cables, poles and other supporting structures necessary to said system." It provided for the payment of an annual license fee in accordance with the grantee's proposal. The original term of the right granted was 10 years, with option for renewal for another 10 years.

Ordinance No. 6355 made no reference to the rates to be charged customers for the service.

On June 21, 1965, the council passed Ordinance No. 6356, amending Ordinance No. 6355 by adding 17 new sections. Among those sections was Section 21, reading as follows:

"All rates or charges to customers shall be in accord with a schedule prepared by the Grantee, approved by a majority vote of the Council of the City of Sedalia, Missouri, and filed with the City Clerk. The original schedule shall be so approved and filed before Grantee shall commence business and no change or alteration therein shall be made until such change also has been approved by a majority vote of the City Council and the new rate filed with the City Clerk."

Just when construction of the system began is not shown. On November 8, 1965, Cablevision, Inc., apparently the name under which the operating company was organized, submitted a letter addressed to the Sedalia Mayor and City Council, which stated:

"The following are the monthly rates to be charged in Sedalia in compliance with our prior agreements with the City of Sedalia, (i. e., Section 21, Ordinance # 6356).

"RATE SCHEDULE—CABLEVISION, INC.

"Monthly Charge: Residential

"$4.50 per month."

The schedule also included charges for additional sets, and hotel, motel and commercial customers. On December 6, 1965, the council approved the schedule. Service to customers began near this time.

On December 2, 1968, the manager of Cablevision, Inc. wrote the city council, requesting permission to change the monthly subscriber rate to $4.90 per month and to add an installation charge of $10.00. Apparently that request was at first denied. On December 3, 1968, counsel for Cablevision, Inc. wrote the council, expressing "surprise and dismay" at the rejection "last evening" of Cablevision's request for a rate increase. The letter expressed the opinion that Sedalia actually had no authority to set the rate that a cable television company may charge a subscriber. The letter said that because they sought to cooperate with the city they had not made an issue of the matter. The letter requested a reconsideration of the request at the next council meeting.

On December 16, 1968, the council did reconsider and agreed to the requested increase.

In January, 1970, LVO Cable Inc. of Tulsa acquired all of the outstanding stock of Cablevision, Inc., for $1,250,000.

In April, 1971, discussions began between Cablevision, Inc. and council members about the need for another rate adjustment.

On July 16, 1971, the attorney for Cablevision, Inc. addressed a letter to the mayor and city council, in which he referred to discussions that had occurred over a period of several weeks of the need of Cablevision, Inc. for a rate adjustment. The letter further stated:

"It has been pointed out in various conversations and in discussions with the previous councils that there is a valid legal question regarding the city's power in the actual establishment of the level of rate of adjustment. It has always been our conviction that the City Council of Sedalia has not the authority to regulate our rates, no more than it has the authority to fix the price of other consumer goods or services. Such authority would be the antithesis of competitive business, and such authority is not delegated by the legislature to a city of the third class.

"Nonetheless, we have heretofore avoided litigating this question, recognizing that public consideration of the rate is in the interest of the council, our subscribers and all concerned. It is then in this spirit that we have presented our proposal to raise our rates to $5.90 effective August 1, 1971. A $5.90 minimum rate is absolutely essential to provide even a minimum return on investment and anything less would be unacceptable to the company."

On July 19, 1971, the council refused to approve the proposed new rate. Nevertheless, Cablevision notified its subscribers that the basic outlet rate in Sedalia would be adjusted to $5.90 per month, effective August 1, 1971.

On August 16, 1971, the council passed an ordinance for the forfeiture of the rights of Cablevision, Inc. for failure to observe the terms of its permit.

This litigation followed. Cablevision, Inc. obtained an injunction against any action to forfeit its permit. The injunction included the condition that the increase in the customer charges be deposited in escrow pending outcome of the litigation.

Count I of Cablevision, Inc.'s petition sought a declaratory judgment that § 21 of Ordinance No. 6356 is ultra vires in that Sedalia as a city of the third class has no power or authority to regulate rates charged cable television subscribers.

Count I was submitted on the pleadings and a stipulation of facts, together with certain admissions of plaintiff. The trial court held § 21 valid. It concluded that, although there was no express grant of power to third class cities with respect to cable television operations, § 77.520, RSMo 1969, V.A.M.S., empowering third class cities to control the use of their streets, authorized the grant of the right conferred upon appellant, and that the city had the power to condition the grant upon the reservation to it of the right to approve the charges to subscribers. In the latter regard, the trial court in its memorandum placed considerable reliance upon the case of Illinois Broadcasting Company v. City of Decatur et al., 96 Ill.App.2d 454, 238 N.E.2d 261 (1968).

On this appeal, appellant's first proposition is that the City of Sedalia has no authority to regulate rates charged customers of a cable television system because there is no statute authorizing a city of the third class to do so. The absence of any such express statutory authority is conceded. That does not, however, render the trial court's judgment erroneous.

■ Appellant obviously recognized that, before it could operate a cable television system in the City of Sedalia, some sort of grant from the city would be necessary, inasmuch as the installation and operation of the system would involve the use of the city streets. A city of the third class does have the right to control the use of its streets. § 77.520, RSMo 1969, V.A.M.S. The statute, although referring expressly to the erection of telephone, telegraph and electric light poles (as well as horse racing, training, and hitching of oxen in the streets) does not expressly refer to the use for the purpose sought by appellant. How-

ever, the absence of such express authority would not preclude the grant of such privilege by the city under its broad power of control of the use of the streets. State ex rel. City of Trenton v. Missouri Public Service Corporation, 351 Mo. 961, 174 S. W.2d 871, 877–878 [4] (banc 1943). The absence of express authority certainly did not deter appellant's predecessor from seeking what the ordinance prepared by it (Ordinance No. 6355) described as "the right, privilege and franchise hereby granted" "to use and occupy the streets, alleys and other public places within the city * * *."

Appellant contends that, given the right of the city to control the use of its streets as exemplified by Ordinance No. 6355, that power does not extend to and include the power to regulate the rates to be charged to customers of the enterprise for which the privilege is granted. Appellant points to cases such as City of St. Louis v. Bell Tel. Co., 96 Mo. 623, 10 S.W. 197 (1888), in which the right of St. Louis to regulate charges for telephone service was denied. There the court said: "The power to regulate the charges for telephone service is neither included in nor incidental to the power to regulate the use of the streets, and the ordinance cannot be upheld on any such ground." 10 S.W. 198. Holding to the same effect is State ex rel. Garner v. Missouri & Kansas Telephone Co., 189 Mo. 83, 88 S.W. 41, 44 (banc 1905). These cases were relied upon by the Springfield Court of Appeals in McCullough v. City of Springfield, Mo., 241 Mo.App. 425, 236 S. W.2d 753 (1951), in denying the right of the city to regulate fares charged by taxicab operators. The court concluded that power to regulate the use of the city streets did not encompass such authority. 236 S.W.2d 757–758 [5].

The factor which distinguishes those cases from the situation here presented, as viewed by the trial court, was that the rate regulation there involved was not a condition of a grant of a privilege or franchise. In the telephone cases, the companies were operating under previously granted franchises. Insofar as appears, the grant of franchise made no reference to rates. No grant of a privilege or franchise in the generally understood sense was involved in the Springfield taxicab case.

■ Before further consideration of this factor, attention should be given appellant's contention that its privileges were accorded by Ordinance No. 6355, and that No. 6356, which includes the rate provision, was an enactment independent of the grant of privilege "which imposes burdens, restrictions and obligations on appellant." From appellant's predecessor's original proposal it is clear that the operator contemplated that its rates would be subject to approval by the city. There is no indication of any action by appellant's predecessor, solely in reliance on Ordinance No. 6355. Finally, and of greatest significance, was the letter submitting the original rate schedule to the city council "in compliance with our prior agreements with the City of Sedalia, (i. e. Section 21, Ordinance # 6356)." This makes quite clear that the original recipient of the grant considered its agreement with the city to consist of Ordinance No. 6356, as well as the first ordinance, No. 6355. Appellant will not be heard to assert otherwise.

Turning to the reasoning of the Illinois Broadcasting Company case, supra, the court there took note of legislation enacted after the grant there involved, and stated (96 Ill.App.2d 459–461, 238 N.E.2d 264):

"* * * Notwithstanding this express grant, and without getting into the question of whether this section would validate an extant ordinance otherwise invalid, we are of the opinion that municipalities prior to the passage of this section had implied power in the very first instance to enact the franchise ordinance under attack. But the power to enact must be carefully distinguished from some of the conditions here imposed, as to which municipalities have no power to exact unless such exaction is agreed to.

"Whence came this power of Decatur's to enfranchise General. The power finds its source in the statutory grant permitting municipalities to regulate the use to be made of their. streets, alleys and public ways—'over, above, beneath and across.' A parallel power with somewhat reverse English grants to cities the right to prevent obstructions. Specifically, § 11–80–2 of the Illinois Municipal Code (Chap. 24, Ill.Rev.Stats.1965) accords to cities the right to regulate the use of its streets and other municipal property, and § 11–80–3 says that the 'corporate authorities of each municipality may prevent and remove encroachments or obstructions upon the streets and other municipal property'. Curbs, gutters and crosswalks are provided for in § 11–80–11, and the space over the streets· and public places in § 11–80–8. These are the sources from which Decatur derives the power to enact this ordinance.

"A business whose product must travel by wire from house to house has to first obtain some type of permission from the city concerned, as wires cannot be strung from house to house without in some way making use of the streets and alleys—'over, above, beneath and across'. As we have seen, the franchise ordinance circumscribes with particularity this use, to the end of incurring a minimum of inconvenience to the public and a maximum of safety. If this is done and the use is reasonable, private use of streets is permissible. Withers v. City of Granite City, 23 Ill.2d 156, 177 N.E.2d 181. There it was stated that the test of what use can be permitted upon or under the streets is measured by whether or not the encroachment is reasonable and in the public interest. In Sears v. City of Chicago, 247 Ill. 204, 93 N.E. 158, it was said in this regard there is no limitation upon the power of a municipality except 'that its exercise shall be reasonable and in a manner to safeguard the paramount right of the public to the free and unobstructed use of the streets.' Certainly the use here contemplated meets this test. If this is so then Decatur has the right to attach—but

not to impose or exact—conditions to such use, though unrelated to it, leaving it up to the person seeking the grant to either accept or reject them. Cast in this mold the ordinance becomes effective only upon acceptance. Rejection, and the ordinance is a dead letter. We see nothing wrong in the city saying in effect: You may use our streets for such and such a purpose as such purpose is reasonable and in the public interest yet before we will grant you this, you must in turn agree to certain conditions collateral to the specific use you desire.

"That some of the conditions present here in the franchise ordinance and indubitably in the specifications ordinance do constitute regulation unrelated to use of the streets is to state the obvious. A quick perusal discloses that a great many are concerned solely with CATV aspects. However, these conditions are self-imposed. They are not imposed by Decatur. If General agrees to be so regulated who can complain? If General accepts a condition to pay a given sum who cares, and if General pays, as we assume it will, who is hurt? If General discovers later on that some of the conditions it agreed to are onerous, it can assuage itself with the thought that surcease is but fifteen years away—a condition, too, it agreed to."

Although rates were not of primary concern, the court noted that the ordinance involved scheduled rates and provided for increases only with the permission of the city.

Appellant asserts that, while this case may be good law in Illinois, it is not the law of Missouri. Appellant says that much more consistent with Missouri law, as found in McCullough v. City of Springfield, supra, is the decision in Community Antenna Television of Wichita, Inc. v. City of Wichita, 205 Kan. 537, 471 P.2d 360 (1970). In that case the court held invalid a Wichita ordinance providing for the issuance of franchise for operation of a cable television system and regulating the

operation, including rates to be charged. The ordinance was declared invalid in an action by a company seeking to operate a system, but which had not sought a franchise under the ordinance. The court declined to uphold the ordinance as an exercise of the police power in the regulation and management of the public streets, stating (471 P.2d 365):

"We do not believe that the requirements and provisions in the ordinance heretofore summarized have any rational relationship to the use and rightful regulation of the city streets. They deal more with the management of the internal affairs of a CATV system which for our review here must be considered as a commercial enterprise."

The court took note of the Illinois case, stating that "the court held many of the conditions of the ordinance could not be exacted but might be agreed to not being against public policy." 471 P.2d 366.

Subsequently, the Kansas legislature specifically authorized municipal regulation of CATV systems. In Community Antenna v. City of Wichita, 209 Kan. 191, 495 P.2d 939 (1972), the court held that such enactment, along with rules promulgated by the Federal Communications Commission (37 Fed.Reg. 3252 [1972]), had destroyed the real basis of its earlier opinion, i. e., "Community antenna television service is a commercial enterprise of non public utility character." 495 P.2d 941. See also Capitol Cable, Inc. v. City of Topeka, 209 Kan. 152, 495 P.2d 885 (1972).

With this acknowledgment that the earlier case was based upon the nature of the business involved, rather than the source of the power, the significance of the earlier case diminishes for purposes of this case. In any event, as the court in the earlier case acknowledged, it was not a case involving a complaint by an operator who had accepted a franchise under the ordinance that he should not be bound by the terms of his acceptance.

As to whether or not the Illinois case is consistent with the law of Missouri, earlier cases in this state indicate that regulation of utility charges by municipalities by way of a franchise agreement was a method employed prior to the public service commission law. Laws of Mo.1913, p. 557. See, for example, City of Joplin v. Wheeler, 173 Mo.App. 590, 158 S.W. 924 (1913); Home Telephone Co. v. City of Carthage, 235 Mo. 644, 139 S.W. 547 (1911); City of St. Louis v. Public Service Commission, 276 Mo. 509, 207 S.W. 799 (banc 1918). In the latter case, the court noted that no case had been before the Supreme Court directly involving the power of a city in such regard. The court stated: "As I understand the decisions, the furthest this court has gone in that direction was to hold that, because the city could altogether deny a street car company the right to operate its roads within its corporate limits, the city had the right to dictate the terms and conditions upon which the road should be operated." 207 S.W. 801–802. It is submitted that such reasoning is wholly consistent with the reasoning of the court in the Illinois case.

According to 12 McQuillin on Municipal Corporations, § 34.151, p. 319 (1970 rev.), "* * * where the municipality has power to refuse the use of its streets to a public service company, and the agreement as to rates to be charged patrons is a part of the grant of the franchise to use the streets and therefore supported by a valuable consideration, the power to impose conditions on granting the franchise includes the power to stipulate in the franchise as to the rates."

The trial court properly held that the city had the right to grant the privilege of the use of its streets for the installation and operation of a CATV system and that, as a condition of the grant of such right, the city could reserve the right to approve the rates to be charged customers of the service.

Appellant conjures up many nefarious consequences which it contends might flow from such a . conclusion. Of course, this litigation concerns only this particular case. Appellant's predecessor sought the privilege which the city conferred and readily agreed to the conditions of the grant. That is the case here and no other problem need be decided.

Turning to the alternative relief sought in Count II, the trial court held the ordinance valid against the attack based upon lack of standards. The court held that the matter of rate approval required the vesting of discretion in the council and that it was impracticable and impossible to fix definite standards in the ordinance. The court further held that the council had not acted arbitrarily in refusing to approve the proposed rate increases.

In 1972, the Federal Communications Commission promulgated regulations for cable television service. 37 Fed.Reg. 3252, et seq. The regulations establish a dual regulatory system which recognizes the authority of local governments to grant franchises for such operations. § 76.31 (37 Fed.Reg. 3281) sets franchise standards and provides, in part:

"(a) In order to obtain a certificate of compliance, a proposed or existing cable television system shall have a franchise or other appropriate authorization that contains recitations and provisions consistent with the following requirements:

\* \* \* \* \* \*

"(4) The franchising authority has specified or approved the initial rates which the franchisee charges subscribers for installation of equipment and regular subscriber services. No changes in rates charged to subscribers shall be made except as authorized by the franchising authority after an appropriate public proceeding affording due process; \* \* \*."

In its comments on this standard, the Federal Communications Commission report stated (37 Fed.Reg. 3276):

"183. *Subscriber rates.* In § 76.31(a)(4) we are permitting local authorities to regulate rates for services regularly furnished to all subscribers. The appropriate standard here is the maintenance of rates that are fair to the system and to the subscribing public—a matter that will turn on the facts of each particular case (after appropriate public proceedings affording due process) and the accumulated experience of other cable communities."

These provisions are not here referred to in order to incorporate them into the ordinance here in question. As the trial court noted, the report of the Federal Communications Commission was not in existence at the time of the council's action here questioned. However, this regulation and the accompanying comment do serve to describe the essentially discretionary authority which approval of CATV service rates involves.

■ With or without the Federal Communications Commission regulation, the standard which it imposes would be the basic guide for approval or disapproval of proposed rates. Because the law implies such standard and because further refinement and elaboration could be unnecessary, the ordinance here is not to be held invalid on this ground. 1 Am.Jur.2d, Administrative Law, § 129, p. 940 (1962). Cases in this state recognize that express standards may not be required "(1) where the ordinance deals with situations which require the vesting of some discretion in public officials, for instance, where it is difficult or impracticable to lay down a definite, comprehensive rule; \* \* \*." Clay v. City of St. Louis, 495 S.W.2d 672, 676 [4] (Mo.App.1973). See Milgram Food Stores, Inc. v. Ketchum, 384 S.W.2d 510, 514 [2–4] (Mo.1964).

Significant here also is that the provisions of the ordinance under attack are not for the guidance of the conduct of the public generally or even of a number of entrepreneurs engaged or wishing to engage in the enterprise in question. The ordinance

is limited to the relationship between the council and the one grantee, again, aware of the terms of the ordinance at the time it chose to accept the privileges granted.

On the question of the reasonablenes of the council's action, the evidence adduced before the trial court showed that beginning in the spring of 1971, representatives of Cablevision had met on several occasions with members of the council and mayor for the purpose of demonstrating the need of the company for increased revenue. An expert in utility rate matters who was also experienced in CATV rate matters was employed by Cablevision. He prepared a report which he presented to the council. The report showed a net operating loss of $2,000 for the year ended May 31, 1970. A pro forma report for the year ended May 31, 1971, showed an operating loss of $10,700. A pro forma report for the same period at the proposed new rates showed a net income of $24,600.

The mayor and one council member testified to the meetings with the Cablevision representatives. According to the mayor, the council was not satisfied with the going concern value of some $750,000, on which the company was taking amortization in computing its net income. The mayor also stated the council requested a breakdown of the operating expenses of appellant, but none was ever furnished.

The council member testified that he was concerned by the failure of Cablevision to produce profit and loss data for the period prior to the purchase of all of the stock by LVO. He stated that he did not believe the operating expense figures shown for Cablevision and that Cablevision declined to produce certified figures. He also disbelieved the depreciation and amortization figures used by Cablevision.

The trial court found that appellant "failed to sustain its burden of proof before the Council to show that such a rate increase was justified." The court pointed to the failure of appellant to show the original cost of the installation of the system in 1965 and its replacement cost in 1971. The court also pointed to the failure of appellant to produce "competent" profit and loss statements and balance sheets for the years that the system had been in operation, despite the requests of council members for such information. The court stated that the "primary difficulty or difference of opinion existing between Cablevision and the City Council" was the "going concern value" of $750,000 and the annual amortization of that sum, charged as an expense by appellant. The court found this item of expense an improper charge against appellant's income.

The outstanding stock of Cablevision, Inc. was purchased by LVO Inc. in January, 1969, for $1,250,000. According to Cablevision's controller, $500,000 of this sum was assigned to the value of the physical assets and $750,000 as "going concern" value. According to the witness, the books of Cablevision did not show the cost of the physical assets on their installation in 1965. Subsequent to LVO's purchase, some $60,000 additions had been made to the plant. The physical assets were being depreciated on a $12\frac{1}{2}$ year basis and the going concern value amortized on a 20-year basis. For the 1970 fiscal year, the depreciation amounted to approximately $56,000. The going concern value amortization amounted to approximately $38,000. The expert witness's profit and loss computation included such deductions.

The opinion of that witness that even the proposed $5.90 basic rate was confiscatory was based upon his acceptance of the $1,250,000 purchase price paid by LVO, less accrued depreciation and amortization, as the basis of the return to which it was entitled.

The council had the right to be skeptical about this basic figure, particularly since LVO's and appellant's accountants assigned

60% of that sum to "going concern" value. Obviously, the record of operation under the previous ownership would have been of significance in determining whether the price paid had a reasonable relationship to the actual value of the enterprise. Likewise, information as to the actual investment in the physical plant would have been relevant. Representatives of appellant advised the council members that such figures were unavailable. As the trial court observed, it is highly doubtful that persons experienced in the purchase of CATV systems would have made the outlay here involved without such information.

The trial court also took note of the failure of appellant to provide the council any evidence of the 1971 replacement cost of its plant. At the trial of this case, appellant's expert witness did state that, as of May, 1971, the replacement cost was in excess of $700,000. However, he acknowledged that he had made no study upon which to base a precise calculation.

■ The council was not obliged to accept the purchase price paid by LVO for the stock of Cablevision as the starting point for approving the proposed rate increase. The council had the right to make inquiries which would enable them to relate such purchase price to the fair value of the enterprise. The council was not bound to approve rates designed to take care of a purchaser who had paid an inflated price for the property based upon a hope for increase in customers which failed to materialize.

Instead of cooperating with the council in its inquiry, in performance of its duty, appellant sought to convince the council by expert testimony on a basis which the council was not prepared to accept.

■ Appellant has set out at length the testimony of its witnesses and urges that such testimony compels the conclusion that the $4.90 rate beyond which the council refused to go is confiscatory. Before any rate of return could be found to be confiscatory, there must be a proper base established. The burden was upon appellant to establish such base and the trial court concluded that it failed to do so.

Appellant attacks the trial court's finding that competent profit and loss statements and balance sheets for the years of operation had not been furnished the council. It points to the testimony of the mayor that the council members were given a "brochure" prepared by appellant's expert witness and that the council accepted the figures, which the expert said had been certified. The report of the expert was placed in evidence at the trial. It contained only current and pro forma profit and loss information. It contains no balance sheet, no information as to profit and loss for earlier years and no details of expenditures, the matters of concern to the council.

■ Appellant also emphasizes that the city undertook no independent audit of appellant's books. The city was not required to do so. The council had the right to require appellant to furnish relevant information, within reason, but appellant failed to do so.

Appellant does not attack the trial court's finding that the amortization of the "going concern" value is not a proper item chargeable against appellant's operating expense. Instead, appellant charges that, in any event, the income based upon the current rates was inadequate on the basis of a $700,000 replacement value. This assumption, of course, ignores the absence of competent evidence of a $700,000 replacement value for the system.

By appellant's figures, actual operating income for 1971, without deduction of amortization of going concern value, was $25,694. This is, in effect, the figure which the trial court found as the net income of appellant for that year. Given the absence of convincing evidence of the base

to which such figure was to be related, the trial court's finding that the council did not act arbitrarily has not been shown to have been erroneous.

Judgment affirmed.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.