MIDWEST TELEVISION, INC., Plaintiff-Appellant, *v.* CHAMPAIGN-URBANA COMMUNICATIONS, INC., *et al.*, Defendants-Appellees.

Fourth District   No. 13241

Opinion filed May 6, 1976.

Dennis K. Muncy and Francis J. Jahn, both of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, of Champaign, and Horace E. Gunn and Robert Z. Hickman, both of Gunn, Hickman, Kesler, Jenkins & Vogel, Ltd., of Danville, for appellant.

Phillips, Phebus, Tummelson & Bryan, of Urbana (Joseph W. Phebus and George G. Bryan, of counsel), for appellee Champaign-Urbana Communications, Inc.

Albert Tuxhorn, City Attorney, and Kurt P. Froelich, Assistant City Attorney, both of Champaign, for appellee City of Champaign.

Reno, O'Byrne & Kepley, of Champaign, for appellee Delbert D. Smith.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

Midwest Television, Inc. (Midwest), brought a class action suit as a taxpayer and property owner against defendants Champaign-Urbana Communications, Inc. (CUCI), the City of Champaign (City), American Television and Communications Corporation (ATC) and Delbert Smith. The complaint was in five counts, and sought, among other relief, a declaratory judgment that the cable television franchise issued by the City to CUCI is void and that defendant Smith be required to refund consultant fees paid to him by the City. All five counts were dismissed by the trial court. Midwest appeals.

All five counts will be treated separately. However, the facts alleged which are common to all the counts will be set forth here.

In December, 1971, the City Council of Champaign, acting in conjunction with the City Council of Urbana, created the Champaign-Urbana Joint Committee on CATV (cable television). The purpose of the Joint Committee was to study cable television and the possibility of granting a cable television franchise for the two cities. In April, 1972, the Committee, with the authorization of the Champaign City Council, hired Delbert Smith as an expert consultant on cable television. He was to receive as payment $13,000, two-thirds to be contributed by Champaign, one-third by Urbana. His duties were to consult with and advise the Joint Committee, design system parameters and specifications, hold public meetings and hearings, announce the system requirements, solicit bids by potential franchisees, analyze the bids, make recommendations to the Committee on the bids, and prepare alternative ordinance provisions.

In October, 1972, eight companies submitted applications to become

the CATV franchisee for Champaign and Urbana. Smith made recommendations about the applicants to the Joint Committee. Upon his advice the Committee recommended to their respective city councils acceptance of the application of defendant CUCI. CUCI was a newly formed company. Fifty percent of the stock was held by American Television and Communications Corporation (ATC), a corporation involved nationwide in cable TV and fifty percent by Champaign-Urbana Communications, Inc., which was formed by a group of local residents of Champaign and Urbana. In February, 1973, the City of Champaign passed an ordinance granting CUCI the cable television franchise for 15 years.

The complaint also alleges that in June, 1972, Smith accepted compensation from the National Cable Television Association (NCTA) for appearance before the Federal Communications Commission to advocate that there be little or no State regulation of cable television. Later in 1972, Smith was hired as a consultant to the Wisconsin Cable Television Association (WCCA). The complaint alleges that Smith did not inform all of the members of the Joint Committee, City Councils of Champaign and Urbana, the applicants for the franchise and the public of his employment by NCTA or WCCA. The complaint also alleged that ATV or its member systems are members of NATV and WCCA, and one official of that organization advocated the hiring of Smith by the WCCA. None of the unsuccessful applicants have joined in this appeal. We are advised that Federal regulations prohibit Midwest Television, Inc., from holding a cable television franchise. Midwest alleges that its interest is its concern over the proper application of tax moneys.

COUNT I

The first count is against defendants Champaign, CUCI and ATV. It seeks to have the ordinance granting CUCI the franchise declared void. The basis for the request is that the various employments of Smith violated the common-law prohibition against conflicts of interest.

Defendants question whether Midwest, as a taxpayer and property owner, has standing to raise any of its claims. In *Illinois Broadcasting Co. v. City of Decatur* (1968), 96 Ill. App. 2d 454, 238 N.E.2d 261, this court held that a taxpayer would have standing to question the validity of an ordinance which would require public moneys to be spent. Defendants however, raise an issue that was not discussed or decided in *Illinois Broadcasting*. They contend that Midwest must first make a demand upon the City before commencing a taxpayer's suit. Admittedly Midwest had not made a demand. Plaintiff contends that demand is excused where it would be useless. In view of our determination of the other questions presented, we find it unnecessary to decide whether a demand was necessary under the facts as alleged.

As we have stated, the first count is based upon the common law which prohibits public officials from acting or voting on contracts in which they are directly or indirectly interested. Defendants vigorously contend that the facts as alleged do not constitute a conflict of interest, as Smith's employment as a consultant to cable television trade associations is not the kind of interest which would affect his actions as consultant to the Joint Committee. We do not decide that question.

There are apparently no cases in Illinois in which the common-law prohibitions against conflicts of interest are directly in issue. In several cases, the courts have remarked that specific statutes codify the existing common law. (*McCarthy v. City of Bloomington*, 127 Ill. App. 215, 217; *Panozzo v. City of Rockford*, 306 Ill. App. 443, 28 N.E.2d 748.) All of the cases in Illinois involve public officers; no case appears in which the person alleged to have a conflict was a mere employee. The issue therefore is whether the common-law prohibitions cover, not only officials, but also employees.

Plaintiff has cited *Seaman v. City of New York*, 159 N.Y. Supp. 563, 172 App. Div. 740 (1916), as an example of a jurisdiction which recognizes employee conflict of interests. *Seaman* has been described as "overly-dignified dicta." (Kaplan & Lillich, *Municipal Conflicts of Interest: Inconsistencies and Patchwork Limitations*, 58 Columbia L. Rev. 157, 166 (1958).) As one court has stated, any survey of laws and cases in this area reveals that the problem is of great complexity and the treatment by different States is disharmonious and without uniformity. (*Brockbank v. Rampton* (1968), 22 Utah 2d 19, 447 P.2d 376.) The vast majority of the cases arise in a statutory context, hence most of the discussion concerning the limits and extent of the common law is contained in the literature. The writers seem in agreement that there is no rational distinction between the public officer and the public employee given the rationale for the conflict of interest rules, namely the duty of an agent to his principal. Ancel, *Municipal Contracts*, 1961 U. Ill. L.F. 357, 369.

■■ However, there is another side of the issue. The problem is trying to draw a line where some remedy can be afforded "to collapses of public morality without being destructive to the system itself." (Eisenberg, *Conflicts of Interest Situations and Remedies*, 13 Rutgers L. Rev. 666, 668 (1959).) If potential conflicts of interests are interpreted broadly and the prohibitions reach both officers and employees, these restrictions can work a severe hardship, especially at the municipal level. Many persons might be discouraged from working at that level since it would require divestment of substantial business interests so that the government may make intermittent or even uncompensated use of their services. (Note, *Conflicts of Interests: State Government Employees*, 47 Va. L. Rev. 1034, 1051 (1961).) It should be emphasized here that the prohibitions are

against even the appearance of illegality. Nevertheless, to judicially extend broad conflict of interest prohibitions to employees, and in the process, to define what is or is not a conflict, especially at the local level, and to determine whether to establish a rule of per se conflict involving the prohibition would require a careful, detailed study of factors which are far beyond the confines of the facts of this case. It would also involve, not the application of an established rule of the common law but rather the creation of a new one. Its impact upon government at all levels would be considerable, as would the resulting uncertainty and confusion. It is exactly this kind of decision that is entrusted to the legislature and is best debated, defined, considered and dealt with in that forum. Accordingly, for these reasons, we decline to find that the common-law prohibitions against conflict of interest apply to all public employees.

## Count II

Count II alleges a violation of the statutory prohibition against conflicts of interest. The statute states:

> "No person holding *any office, either by election or appointment under the laws or constitution of this state,* may be in any manner interested, either directly or indirectly, in his own name or in the name of any other person, association, trust or corporation, in any contract or the performance of any work in the making or letting of which such officer may be called upon to act or vote. No such officer may represent, either as agent or otherwise, any person, association, trust or corporation, with respect to any application or bid for any contract or work in regard to which such officer may be called upon to vote. Nor may any such officer take or receive, or offer to take or receive, either directly or indirectly, any money or other thing of value as a gift or bribe or means of influencing his vote or action in his official character. Any contract made and procured in violation hereof is void." (Emphasis added.) Ill. Rev. Stat. 1971, ch. 102, §3.

■■■ This section is applicable to "public officers." A public officer's duty does not arise out of a contract or depend for its duration upon the terms of a contract. (63 Am. Jur. 2d *Public Officers and Employees* §1 (1972).) The characteristics of a public office are generally agreed upon, although the distinction between an office and employment may be vague in particular fact situations. The characteristics of a public office include: (1) creation by statute or constitution; (2) exercise of some portion of the sovereign power; (3) a continuing position not occasional or contractual; (4) fixed tenure; (5) an oath is required; (6) liability for misfeasance or nonfeasance; and (7) the official has an independence beyond that of employees. (Note, *Conflicts of Interests: State Government Employees,*

47 Va. L. Rev. 1034, 1039 (1961); also *Wargo v. Industrial Commission*, 58 Ill. 2d 234, 317 N.E.2d 519.) Not all these factors are required in order to determine that a position is an office. (*People v. Brady*, 302 Ill. 576, 135 N.E. 87.) However, it is apparent that *none* of the characteristics fit Smith's position as consultant to the ad hoc advisory Joint Committee. See *Pacific Finance Corp. v. City of Lynwood*, 114 Cal. App. 509, 300 P. 50, 1 P. 2d 520 (1931).

Plaintiff argues that the statute should be interpreted liberally so as to include not only public officers but all public employees as well. This is apparently a question of first impression in Illinois.

We start first with two well-recognized rules of construction. The first is that when a statute uses words which have a well-known legal meaning, courts will assume that is the meaning intended by the legislature. (*Department of Public Works & Buildings v. Wishnevsky*, 51 Ill. 2d 550, 283 N.E.2d 872.) Words will be given their plain and ordinary meaning. *Jackson v. Jackson*, 55 Ill. App. 2d 77, 204 N.E.2d 153.

The second rule of construction is that penal statutes will be strictly construed and will not be extended beyond their obvious or literal meaning. (*People v. Eagle Food Centers, Inc.*, 31 Ill. 2d 535, 202 N.E.2d 473.) The violation of which Smith is accused is now a Class 4 felony and, prior to 1973, could be punished by up to 5 years' confinement, and/or a fine. Ill. Rev. Stat. 1971, ch. 102, §4.

■■ For these reasons we decline to construe the statute as including within its prohibitions all public employees as well as officers. The legislature has specifically included employees as well as officers, in at least one conflict of interest prohibition. (Ill. Rev. Stat. 1971, ch. 24, §4—8—6.) All of these factors combine to persuade us that it would be an act of judicial law making to conclude that the legislature did not mean what it said but intended something far beyond the obvious and literal reach of the statutory words. For a similar result in another State, see *State v. Taylor* (1966), 260 Iowa 634, 144 N.W.2d 289.

Count III

In Count III of the complaint Midwest seeks to have the contract between defendant Smith and the City declared null and void because of Smith's alleged conflict of interest. Midwest requests that Smith be ordered to pay back all sums received from the City and be enjoined from performing any further work for the Joint Committee. The count is against Smith, individually, and no other defendants are joined.

■■ ■ Plaintiff has failed to join the City, who is a necessary and indispensable party. The parties to the contract which is sought to be declared null and void would be indispensable parties because such a determination would obviously affect the rights of all contracting persons. (*Georgeoff v. Spencer*, 400 Ill. 300, 79 N.E.2d 596.) It would also appear

that the City of Urbana, who is not named as a defendant in any count, must be a necessary party since the count seeks to enjoin Smith from carrying out existing obligations to the Joint Committee, for which services Urbana also pays. Plaintiff objects that this question is being raised for the first time on appeal. The absence of an indispensable party is something that could be raised by the court, trial or appellate, if no party brings it to the court's attention. (*Georgeoff.*) It is not too late to raise this question.

■■ This count also alleges unauthorized practice of law by Smith. Although all well-pleaded facts are taken as true in a motion to dismiss, it is nevertheless necessary to plead facts and not conclusions. (*Stenwall v. Bergstrom*, 398 Ill. 377, 75 N.E.2d 864.) To say that Smith performed legal services is to allege conclusions. Smith's contractual services included advice on technical matters such as the design specifications for a cable system. Smith was also obliged to make recommendations on the bids, and prepare alternative ordinance provisions. Midwest has cited no authority, nor have we found any, which provides that only a lawyer admitted to practice in Illinois may write ordinances. Considering the diverse occupations represented on city councils and committees, such a requirement would be a surprise to a great many citizens. In addition, we note that lawyers admitted to practice in other States may be permitted to practice in Illinois under certain circumstances. (Ill. Rev. Stat. 1971, ch. 13, §12; Ill. Rev. Stat. 1971, ch. 110A, §707.) Midwest has not alleged any facts which suggest that those sections are not applicable to Smith.

Count IV

This count is brought by Midwest as a taxpayer against CUCI and the City of Champaign. It alleges that the original franchise ordinance provided for payment of 5% of the annual gross receipts to the City for the first three years. The count further alleges that the FCC denied a certificate of compliance because the City had not made a showing that more than 3% of gross revenues was necessary. (The FCC took such action after Midwest protested to it that no showing of necessity had been made.) The count further alleges that Smith advised the City that such a showing could be made, but that the City, instead, chose to substitute 3% for the 5% figure. The count alleges that this will cost the City's taxpayers money and therefore requested an injunction to prevent the franchisee from starting operations.

■■ It is apparent that this count is fatally defective for failure to state a cause of action. The count does not allege any fraud or illegality. It merely alleges that the City took a discretionary action in response to the action by the FCC. Under the facts as they are alleged, the City could

have chosen the alternative route of attempting to reverse the FCC's decision.

■■ The City has the power to enact a cable television ordinance and grant a franchise which requires payment by the franchisee. (*Illinois Broadcasting Co. v. City of Decatur*, 96 Ill. App. 2d 454, 238 N.E.2d 261.) Plaintiff is attacking the payment provisions, apparently on the ground that 3% rate is unreasonable. The wisdom of the City's action is not a judicially reviewable matter. Such a legislative determination is not reviewable when there is no allegation of a manifest and palpable abuse of discretion by the City. (*Hunt v. City of Peoria*, 30 Ill. 2d 230, 195 N.E.2d 719.) We cannot reasonably interpret the facts alleged as being an allegation of a manifest abuse of the City's discretionary powers. Accordingly the count fails to state a cause of action.

COUNT V

In this count, Midwest, as a property owner and taxpayer seeks to have the entire cable television ordinance declared void on the ground that one of the sections provides for the taking of property without due process of law.

That section states:

> "*Section 10 The Use of City Streets*
> (10) If the grantee seeks to construct and maintain its cables and/or other equipment on or about private property, and an easement for such use has already been granted to a telephone company or other public utility, said easement shall, *if at all possible*, be interpreted so as to grant the Grantee the same rights and privileges as have been granted to telephone companies and other public utilities. In such easements, the words 'telephone' or 'telephone company' shall be interpreted to include the Grantee."
> (Emphasis supplied.)

Midwest contends that this section constitutes a taking without compensation and due process.

Plaintiff does not allege that it is a property owner who has granted such an easement to another utility which might be affected. In *Peabody Coal Co. v. Northwestern Elevated R.R. Co.*, 230 Ill. 214, 82 N.E. 573, the Coal Company challenged the Elevated Company's right to condemn an easement in the air over its railroad tracks in violation of the height requirements in the ordinance granting the Elevated Company right to condemn. The Elevated challenged Peabody's standing on the ground that only the railroad could protest. The court stated that objection could be made by any party having a property interest in the track or right of way which the Elevated was to cross.

In order to challenge a taking one must have a property interest which

is affected. The converse of that proposition is also true. One not alleging a property interest affected would not have standing to challenge the supposed taking.

■■ In addition, the section of the ordinance does not authorize an unconstitutional taking without due process. The ordinance only authorizes that easements to other utilities shall be interpreted to include the right to construct and maintain cable television wires. This limiting phrase has an obvious purpose. If an easement can legally be construed so as to include cable wires (as some easements have been, see *Jolliff v. Hardin Cable Television Co.* (1971), 26 Ohio St. 2d 103, 55 Ohio Op. 2d 203, 269 N.E.2d 588) then it should be so construed. Otherwise the easement will, of course, have to be purchased from the land owner. The ordinance does not authorize taking an easement without compensation.

Accordingly, the judgment of the circuit court of Champaign County is affirmed.

Judgment affirmed.

TRAPP, P. J., and CRAVEN, J., concur.