AMERICAN TELEPHONE AND TELEGRAPH COMPANY *et al.*, Plaintiffs-Appellees, v. THE VILLAGE OF ARLINGTON HEIGHTS *et al.*, Defendants-Appellants.

First District (4th Division)   No. 1—89—1764

Opinion filed June 28, 1991.

McMORROW, J., dissenting.

Jack M. Siegel, of Chicago, for appellants.

Thomas R. Phillips, O. Carey Epps, and Dennis S. Pines, and Gerald A. Ambrose, J. Andrew Schlickman, and John A. Heller, all of Sidley & Austin, all of Chicago, for appellees.

JUSTICE JOHNSON delivered the opinion of the court:

Plaintiffs, American Telephone and Telegraph Company, a New York corporation, and AT&T Communications of Illinois, Inc., an Illinois corporation (hereinafter collectively referred to as AT&T), brought an action in the circuit court of Cook County against defendants, the Villages of Arlington Heights, Palatine, Barrington, Lake Barrington, and the City of Crystal Lake, to compel defendants to allow AT&T to install a fiber optic telecommunications cable under defendants' streets. Defendants are all Illinois municipal corporations. Plaintiffs initially sought a preliminary injunction, a declaratory judgment, and an order of *mandamus*.

The trial court entered a preliminary injunction in favor of plaintiffs, allowing them to construct and maintain the fiber optic cable under defendants' public streets. An interlocutory appeal was taken by defendants from the preliminary injunction. This court affirmed the grant of the preliminary injunction. Later, the Illinois Supreme Court denied defendants' petition for leave to appeal and the cause returned

to the circuit court for trial on the preliminary injunction. The trial court entered an order *nunc pro tunc* as of June 5, 1989, giving plaintiffs the right to construct their fiber optic telecommunications cable beneath the streets of the defendant municipalities. Defendants appeal from the final judgment order.

The following issues are before this court for review: (1) whether this court's opinion on the interlocutory appeal was a determination on the merits; and (2) whether a municipality in Illinois may require a franchise agreement as a precondition for the use of public streets by a public utility.

We affirm.

### BACKGROUND

Plaintiffs were engaged in the construction of an 85-mile-long fiber optic cable. Plaintiffs planned to extend the cable from Glenview, Illinois, to Rockford, Illinois. At the time this case was filed, a majority of the cable had already been installed on the side of a railroad roadbed owned by the Chicago and North Western Transportation Company pursuant to an easement granted to AT&T. However, the cable would undercross public streets in the defendant municipalities at points where the railroad roadbed owned by the Chicago and North Western Transportation Company intersected with defendants' public streets.

AT&T's first contact with defendants took place in February of 1987. At that time, a representative of AT&T was informed by the Village of Arlington Heights that AT&T would have to obtain a franchise in order to use the public streets of the village for its cable. Plaintiffs were also informed that the Northwest Municipal Conference would negotiate franchise agreements between AT&T and the various municipalities whose public streets would be used by AT&T.

In March of 1987, representatives of AT&T met with representatives of the Northwest Municipal Conference. The representatives of the Northwest Municipal Conference informed AT&T that a franchise, or a similar agreement, must be obtained from each defendant municipality before a public utility such as AT&T would be permitted to use their public streets. Representatives of the Northwest Municipal Conference initially requested that AT&T enter into a franchise agreement with them which was similar to AT&T's agreement with the City of Chicago. AT&T's agreement with the City of Chicago provided for the payment of "franchise fees" consisting of 2% of AT&T's gross revenues derived from long-distance calls originating in Chicago, or a

minimum of $5 million per year. AT&T refused to agree to the proposal. AT&T maintained that it declined to agree to this proposal because the franchise fees requested had no relationship to the burden imposed upon defendants by AT&T's use of their streets, or to public safety within the defendant municipalities.

When AT&T refused to agree to tender a percentage of its gross revenues, defendants suggested that an agreement between Western Union and several Illinois municipalities, which was drafted by the Northwest Municipal Conference, could serve as the model for an agreement between defendants and AT&T. Under the "Western Union model," AT&T would have been required to pay defendants $2.50 for each foot of cable installed within their municipalities. AT&T also rejected this proposal.

Finally, AT&T offered to pay defendants $1 for each foot of fiber optic cable installed within defendants' public way, in addition to an administrative fee of $5,000 per year. AT&T and the representatives of the Northwest Municipal Conference failed to reach a compensation agreement.

The Villages of Arlington Heights, Barrington, and Palatine have ordinances which enunciate the criteria for obtaining permission to tunnel under their public streets. The City of Crystal Lake has similar provisions in its city code. These ordinances all require an applicant to provide certain information and meet certain conditions before a permit may be issued. However, none of these ordinances requires a permit applicant to enter into a "franchise agreement" with the municipality in order to obtain a permit.

In 1987, AT&T submitted permit applications to defendants pursuant to the municipalities' respective ordinances. In May of 1987, AT&T applied to the City of Crystal Lake for a permit to construct a telecommunications cable under its street crossings. In July of 1987, AT&T submitted similar permit applications to the Villages of Arlington Heights, Barrington, and Palatine. These villages and the City of Crystal Lake refused to issue permits to AT&T, because AT&T declined to enter into franchise agreements with them. A permit was initially granted by the Village of Lake Barrington; however, this permit was subsequently revoked prior to the installation of the fiber optic cable.

On August 11, 1987, AT&T mailed 10-day notices to the Villages of Arlington Heights, Barrington, and Palatine in an effort to invoke rights granted to it in section 4 of the Telephone Company Act (hereinafter the Telephone Act) (Ill. Rev. Stat. 1987, ch. 134, par. 20). The 10-day notices stated that AT&T intended to begin constructing its fi-

ber optic cable under various streets of the defendant municipalities. A similar letter was mailed to the City of Crystal Lake on September 11, 1987.

AT&T commenced work in the Villages of Arlington Heights and Palatine without having obtained permits, and without having entered into franchise agreements with defendants. Defendants responded by ordering AT&T to stop working. Subsequently, AT&T filed a complaint against defendants.

Plaintiffs sought a preliminary injunction to prevent defendants from interfering with the installation of the fiber optic cable under their public streets. During the injunction hearings, defendants maintained that "[r]equiring payment of a fee as a condition for use of *** property by a commercial enterprise is a legitimate means of raising revenue." Defendants also took the position that AT&T had "no right whatsoever" to undercross their streets, and that they have an "absolute right to exclude" AT&T from any use of public streets except on such terms as they may demand. Plaintiffs also sought a declaratory judgment stating that defendants were not entitled to require them to obtain permits and enter into franchise agreements. The original complaint also contained a prayer for an order of *mandamus* requiring defendants to allow AT&T to construct its cable system under defendants' street crossings.

On November 2, 1987, the trial court entered an interlocutory order granting a preliminary injunction in favor of plaintiffs which allowed them to "construct, maintain, lay, alter, bore or locate and use its fiber optic cable along, upon, under, and across any highway, street, road, or alley under the control or claimed control of the defendants." Subsequently, defendants appealed from the interlocutory order. On appeal, this court affirmed in part and reversed in part the decision of the trial court. *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, *appeal denied* (1988), 123 Ill. 2d 555.

On May 2, 1989, plaintiffs filed a motion to convert the preliminary injunction to a permanent injunction. The court issued an injunction which permanently enjoined defendants from "interfering with or disrupting the ongoing operation of plaintiffs' fiber optic telecommunications system." The court ruled that plaintiffs had the right to construct their fiber optic telecommunications cable beneath the streets of the defendant municipalities pursuant to the Telegraph Act (Ill. Rev. Stat. 1987, ch. 134, par. 4), and the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111⅔, par. 13—202). The court also ruled that plaintiffs had a right to operate the cable without interference or disrup-

tion by defendants. The order was entered *nunc pro tunc* as of June 5, 1989.

Defendants filed their notice of appeal on June 28, 1989. AT&T moved to dismiss the appeal. Subsequently, defendants moved for a direct appeal to the supreme court pursuant to Rule 302(b) (134 Ill. 2d R. 302(b)). The supreme court denied defendants' motion on August 16, 1989. This court denied AT&T's motion to dismiss on September 28, 1989. This appeal is taken from the trial court's order of June 5, 1989.

OPINION

I

First, defendants contend that this court's decision on the interlocutory appeal in *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, should be reversed because this court's opinion was not a full determination on the merits, and, insofar as this court went beyond determining whether there was an abuse of discretion by the trial court, its holdings are mere *dicta*.

■ Defendants have correctly noted that "the purpose of a preliminary injunction is to preserve the status quo and not to determine controverted rights or decide the merits of a case." (*U-Haul Co. v. Hindahl* (1980), 90 Ill. App. 3d 572, 575.) However, a successful movant for a preliminary injunction must show "a reasonable likelihood of success on the merits." *Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 718.

Defendants are correct that this court's opinion on the interlocutory appeal was not a full determination on the merits. (See *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381.) However, insofar as this court went beyond determining whether the trial court abused its discretion, its findings are valid because they are relevant with respect to the question of whether plaintiffs are ultimately likely to prevail on the merits. (See *Preferred Meal Systems, Inc.*, 199 Ill. App. 3d at 718.) Therefore, we find that this court's decision was proper, and we will not reverse this court's decision on the interlocutory appeal.

II

Next, defendants maintain that an Illinois municipality may require a franchise agreement as a precondition for the use of public streets by a public utility. Specifically, defendants assert that they may require a franchise agreement because the Telegraph Act pro-

vides that a municipality must consent to a telephone utility's use of the public streets. (Ill. Rev. Stat. 1987, ch. 134, par. 4.) Defendants also argue that a franchise agreement is *necessary* for a public utility to utilize the public streets of a municipality. Plaintiffs contend that a municipality does not have an absolute right to bar a telephone utility from the use of its public streets.

Section 4 of the Telegraph Act contains the following provisions:

> "No such company shall have the right to erect any poles, posts, piers, abutments, wires or other fixtures of their lines along or upon any public ground *** within any incorporated city, town or village, without the consent of the corporate authorities of such city, town or village. The consent herein required must be in writing, and shall be recorded in the recorder's office of the county. ***
>
> The right of any such company to erect such structures, wires or fixtures within the right of way of any public highway is subject to the provisions of Section 9—113 of the 'Illinois Highway Code' as the same may from time to time be amended." Ill. Rev. Stat. 1987, ch. 134, par. 4.

■ Illinois courts have interpreted section 4 of the Telephone Act. In *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, this court made the following finding:

> "[S]ection 4 of the Telephone Act clearly shows that defendants' consent is not mandatory before access to the streets [for the purpose of installing telephone wires] can be obtained. [Citation.] Section 4 of the Telephone Act expressly authorizes the telephone company to install its facilities when it is necessary." (*American Telephone & Telegraph Co.*, 174 Ill. App. 3d at 385.)

Moreover, this court specifically held that "neither plaintiffs nor defendants have an absolute right over the use of public streets." (*American Telephone & Telegraph Co.*, 174 Ill. App. 3d at 387.) We also noted that power has been granted to the General Assembly to permit the use of public streets, but that such power must be strictly construed. In addition, we have found that the powers and rights granted to a municipality over the streets of a city are regulatory in character. *American Telephone & Telegraph Co.*, 174 Ill. App. 3d at 387.

In addition, our supreme court has ruled that the municipal power to regulate the use of the streets and the concomitant power "to charge a license fee in connection with the exercise of the regulatory powers" (*City of Chicago Heights v. Western Union Telegraph Co.*

(1950), 406 Ill. 428, 433) must "bear some reasonable relation to the additional burdens imposed upon the municipality by the business or occupation." *City of Chicago Heights*, 406 Ill. at 433-34.

■ One year later, the supreme court ruled that a fee required of a telecommunications utility for the use of a municipality's streets must bear some relation to the amount of street space used for the wires. (*City of Chicago Heights v. Public Service Co.* (1951), 408 Ill. 310, 318.) The court held that compensation which bears no relation to the amount of space occupied by telecommunications wires is "wholly lacking in uniformity, and is purely arbitrary and discriminatory in its nature." *City of Chicago Heights*, 408 Ill. at 318.

Later that same year, the supreme court ruled that a municipality's regulatory and police powers over its public streets are subject to a reasonableness limitation. Specifically, the court held that "license fees charged must bear some reasonable relation to the additional burdens and necessary expense involved in the regulation and supervision of the business affected, otherwise the ordinance imposing the license fees will be *** deemed null and void." *City of Chicago Heights Public Service Co.* (1951), 408 Ill. 604, 608-09.

The supreme court also mandated that "a municipality cannot, under the guise of an exercise of a police power, impose a license fee for revenue purposes." *City of Chicago Heights v. Western Union Telegraph Co.* (1950), 406 Ill. 428, 434.

A

■ We find that a municipality does not have an absolute right to require a franchise agreement as a precondition for the use of public streets by a telecommunications utility. First, defendants maintain that they have an absolute right to require a franchise agreement as a precondition for the use of their public streets by defendants, because the Telegraph Act requires municipal consent. (Ill. Rev. Stat. 1987, ch. 134, par. 4.) Defendants are correct that the Telegraph Act requires written consent from a municipality before any such company may "erect any poles, posts, piers, abutments, wires or other fixtures of their lines along or upon any public ground *** within any incorporated city, town or village." (Ill. Rev. Stat. 1987, ch. 134, par. 4.) However, the issue of whether a municipality has absolute, arbitrary power over the use of municipal streets by a telephone utility was decided against defendants by this court in *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381. In *American Telephone & Telegraph Co.*, we found that although power has been granted to the General Assembly to permit the use of

municipal streets, this power is to be strictly construed. (*American Telephone & Telegraph Co.*, 174 Ill. App. 3d at 387.) We specifically ruled that "neither plaintiffs nor defendants have an absolute right over the use of public streets." (*American Telephone & Telegraph Co.*, 174 Ill. App. 3d at 387.) In addition, the Illinois Supreme Court has twice refused to consider defendants' pleas that this court and the trial court erred in rejecting defendants' claims to unlimited power over the use of public streets by telecommunications companies. Defendants have failed to distinguish the aforementioned cases upon which we rely.

Furthermore, we find defendants' reliance upon *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324, *People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260, *Illinois Bell Telephone Co. v. Lewis* (1983), 117 Ill. App. 3d 72, *Lewis v. Illinois Bell Telephone Co.* (1981), 98 Ill. App. 3d 1047, and *Reith v. General Telephone Co.* (1974), 22 Ill. App. 3d 337, unpersuasive and inappropriate. Defendants rely upon *People ex rel. Shallberg* in support of their position that the Telephone Act does not grant authority to a telephone utility to place its telecommunication wires in a municipal street without the consent of that municipality. (*People ex rel. Shallberg*, 232 Ill. at 275.) In addition, defendants cite the following finding made by the court in *People ex rel. Shallberg* in support of their position:

> "The [Act] *** expressly provides that nothing contained in it shall interfere with the control vested in cities, incorporated towns and villages in relation to the regulation of the poles, wires, cables and other appliances. That control is not limited to prescribing the location and size of the poles, and such matters, but extends to the whole subject." *People ex rel. Shallberg*, 232 Ill. at 276.

As we stated above, the Telegraph Act requires consent from a municipality before a telephone utility may "erect any *** wires or other fixtures of their lines along or upon any public ground *** within any incorporated city, town or village." (Ill. Rev. Stat. 1987, ch. 134, par. 4.) However, under current Illinois common law, a municipality's control over the use of its streets by a telecommunication utility does not "extend[ ] to the whole subject." (See *People ex rel. Shallberg*, 232 Ill. at 276.) A municipality's control over the use of public streets is *not* absolute. (*American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, 387.) Moreover, this court has ruled that a municipality's "consent is for the purpose of notifying the municipality in advance of intended construction

so that it can exercise its regulatory power of time, manner, and location of the construction." *American Telephone & Telegraph Co.*, 174 Ill. App. 3d at 386.

Defendants also rely upon *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324. In *City of Springfield*, the court held that a municipality's power to permit the use of its streets by "public service corporations" is "discretionary" (*City of Springfield*, 279 Ill. at 327), and that a "city council may, in its discretion, grant a license for the occupation of the streets without qualification, or may impose such conditions upon the giving of its consent *** as it deems advisable." *City of Springfield*, 279 Ill. at 327.

We noted above that current case law has mandated that a municipality's right to control the use of its public streets must be *"strictly construed."* (Emphasis added.) (*American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, 387.) This court has specifically found that a municipality does not have an absolute right over the use of its public streets. See *American Telephone & Telegraph Co.*, 174 Ill. App. 3d at 387.

Defendants' reliance upon *Reith v. General Telephone Co.* (1974), 22 Ill. App. 3d 337, is also inappropriate. We have already found that *Reith* is distinguishable from the instant case. The issue in *Reith* was whether a company that obtains a license from a municipality to use its streets may evade liability when injuries result from such use. This issue has little, if any, relevance to the case at bar.

Finally, we find that defendants' reliance upon *Lewis v. Illinois Bell Telephone Co.* (1981), 98 Ill. App. 3d 1047, and *Illinois Bell Telephone Co. v. Lewis* (1983), 117 Ill. App. 3d 72, is inappropriate. In *Lewis v. Illinois Bell Telephone Co.* (1981), 98 Ill. App. 3d 1047, the property in question was private property. (*Lewis*, 98 Ill. App. 3d at 1048.) *Lewis* is not relevant to the instant case because the property in question in the instant case is public property committed to public use by the Telegragh Act. (Ill. Rev. Stat. 1987, ch. 134, par. 2.) Moreover, the issue in both of these cases is the extent of a public utility's eminent domain power. Accordingly, we find that defendants do not have an absolute right to bar plaintiffs from the use of public streets.

## B

Defendants also maintain that they have an absolute right to require that plaintiffs enter into a franchise agreement with them as a prerequisite for plaintiffs' use of their public streets. Defendants ar-

gue that a franchise agreement is necessary before a public utility may utilize the public streets of a municipality.

■ We find that a franchise agreement is not a necessary prerequisite for plaintiffs' use of defendants' streets. Defendants do not have an absolute right to require that plaintiffs enter into a franchise agreement as a precondition to the use of their public streets. First, the Telegraph Act has no provision which states that a franchise agreement is a necessary prerequisite for a telephone utility's use of a municipality's public streets, or that a telephone utility must pay a municipality franchise fees for use of that municipality's public streets. The Telegraph Act merely requires the consent of municipal authorities before a telephone utility may place telephone wires upon public property. Ill. Rev. Stat. 1989, ch. 134, par. 4; see also *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, 385.

In addition, the common law clearly states that municipalities may not charge permit or license fees which bear no reasonable relationship to the burdens imposed by the particular proposed use of the public streets. (See *City of Chicago Heights v. Public Service Co.* (1951), 408 Ill. 604, 608-09; *City of Chicago Heights v. Public Service Co.* (1951), 408 Ill. 310, 318; *City of Chicago Heights v. Western Union Telegraph Co.* (1950), 406 Ill. 428, 433-34.) In Illinois, "[t]he terms 'franchise' and 'license' are sometimes used interchangeably." (*General Electric Cablevision Corp. v. City of Peoria* (1972), 8 Ill. App. 3d 948, 951.) The record shows that defendants have attempted to charge the plaintiffs license or franchise fees which bear no reasonable relationship to the burdens which would be imposed by plaintiffs upon defendants. Plaintiffs' telecommunications cable undercrosses defendants' streets where property owned by the Chicago and North Western Transportation Company intersects with defendants' public streets. Defendants attempted to charge plaintiffs millions of dollars in franchise fees. These fees bore no reasonable relationship to the minimal burdens which plaintiffs have imposed upon defendants by running their cable underneath short segments of defendants' streets.

Moreover, the record indicates that defendants sought to charge plaintiffs exorbitant franchise fees as a "means of raising revenue." This is clearly impermissible. In Illinois, "a municipality cannot, under the guise of an exercise of a police power, impose a license fee for revenue purposes." *City of Chicago Heights*, 406 Ill. at 434.

In addition, we find that defendants' reliance upon *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, *cert. denied* (1942), 316 U.S. 670, 86 L. Ed. 1746, 62 S. Ct. 1046, *Village of West*

*City v. Illinois Commercial Telephone Co.* (1939), 372 Ill. 493, *City of Edwardsville v. Central Union Telephone Co.* (1923), 309 Ill. 482, *People ex rel. City of Chicago v. Chicago Telephone Co.* (1906), 220 Ill. 238, *Illinois Broadcasting Co. v. City of Decatur* (1968), 96 Ill. App. 2d 454, *Coles-Moultrie Electric Cooperative v. Illinois Commerce Comm'n* (1985), 131 Ill. App. 3d 946, and *General Electric Cablevision Corp. v. City of Peoria* (1972), 8 Ill. App. 3d 948, inappropriate. Defendants argue that *City of Edwardsville* and *Village of West City* establish that a municipality has the right to require that a telecommunications utility enter into a franchise agreement with it as a prerequisite to using the public streets to house a telecommunications cable. We find that *Village of West City* mandates that a municipality *may* enter into a franchise agreement with a public utility. (*Village of West City*, 372 Ill. at 495-96.) However, *Village of West City* does not state that a municipality has a right to force a telephone utility to enter into a franchise agreement or that a franchise agreement is a necessary precondition to use of the streets by a telecommunications utility. Similarly, defendants have misinterpreted *City of Edwardsville*. The issue in *City of Edwardsville* was whether a statute which imposed a penalty for posts and poles exceeding a certain height was applicable to the Central Union Telephone Company. *City of Edwardsville* concerns statutory construction (*City of Edwardsville*, 309 Ill. at 483, 486-88), and it does not address the issue of whether a municipality may compel a telephone utility to enter into a franchise agreement or whether a franchise agreement is a necessary prerequisite for a telecommunications utility's use of public streets. Therefore, *City of Edwardsville* and *Village of West City* are inapplicable to the case at bar.

Similarly, defendants assert that *People ex rel. City of Chicago v. Chicago Telephone Co.* (1906), 220 Ill. 238, mandates that a telephone company cannot place its wires upon the streets of a municipality without a franchise. Defendants' interpretation of this case is also erroneous. *Chicago Telephone Co.* concerned the nature of rates which telephone customers could be charged. *Chicago Telephone Co.*, 220 Ill. at 239, 240-41.

In addition, defendants maintain that *Illinois Broadcasting Co. v. City of Decatur* (1968), 96 Ill. App. 2d 454, and *General Electric Cablevision Corp. v. City of Peoria* (1972), 8 Ill. App. 3d 948, mandate that franchise agreements between public utilities and municipalities are authorized by various statutory grants which permit municipalities to regulate the use of their streets. We find that *Illinois Broadcasting Co.* and *General Electric Cablevision Co.* are not appli-

cable to the case at bar, because these cases specifically involve the granting of franchises by municipalities to private cable television corporations. Therefore, these cases are not relevant with respect to the legality and scope of franchise agreements between a municipality and a public telecommunications utility.

Finally, defendants contend that *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, *cert. denied* (1942), 316 U.S. 670, 86 L. Ed. 1746, 62 S. Ct. 1046, mandates that municipalities have unlimited franchise powers over their streets, and that this court misread *City of Geneseo* and interpreted it as giving control over municipal streets to the Illinois Commerce Commission. We are not persuaded by defendants' arguments. In *City of Geneseo*, the Illinois Supreme Court held that the powers granted to the Illinois Commerce Commission by the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111⅔, par. 13—202) do not deprive municipalities of regulatory authority over the use of streets by public utilities. (*City of Geneseo*, 378 Ill. at 530.) This court so construed the case and held that "*Geneseo* is not dispositive of [the case at bar]," in which an entirely different issue is involved. (*American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, 385.) The issue in the instant case is whether municipal regulatory authority over placement of telephone company facilities in public streets is absolute or is limited by law.

For these reasons, we find that defendants do not have an absolute right to require a franchise agreement as a prerequisite for the use of their public streets by plaintiffs, and that a franchise agreement is not a necessary precondition for plaintiffs to utilize the public streets of the defendant municipalities.

For the aforementioned reasons, we affirm the decision of the circuit court of Cook County.

Affirmed.

LINN, J., concurs.

JUSTICE McMORROW, dissenting:

I respectfully dissent. The majority erroneously determines that the municipalities do not possess the lawful authority to prohibit AT&T's use of public streets pending negotiation of a franchise agreement. The majority's decision is in direct conflict with Illinois Supreme Court case law precedent and applicable Illinois statutory law. The majority's ruling is particularly disturbing, because it virtually

nullifies both the municipal power to regulate a public utility's use of public streets and the municipal authority to charge a franchise fee for such use.

## I

The instant appeal presents the question of whether the municipalities possess the lawful authority to condition their consent to AT&T's use of public streets upon the negotiation of a franchise agreement for such use. In my view, Illinois statutes and case law precedent grant to the municipalities the power to prohibit AT&T's use of public streets pending negotiation of a franchise agreement.

According to the record, AT&T is a public utility that has been issued a certificate of public necessity and convenience, from the Illinois Commerce Commission, to operate AT&T's telecommunications system in this State. However, the Public Utilities Act explicitly provides that a certificate of public necessity and convenience does *not* confer a franchise, license, or other power upon the public utility. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 8—406.) Consequently, AT&T's receipt of a certificate of public necessity and convenience does not grant it the automatic right to use public streets for its stated business purpose.

Other statutory provisions set forth limitations upon AT&T's use of public streets. (Ill. Rev. Stat. 1987, ch. 134, pars. 4, 20 (hereinafter the Telegraph Act and the Telephone Company Act, respectively).) Section 4 of the Telegraph Act provides that AT&T cannot use public streets "without the consent of the corporate authorities" of the municipalities. (Ill. Rev. Stat. 1987, ch. 134, par. 4.) In addition, section 4 of the Telephone Company Act states that AT&T's use of public streets "shall [not] interfere with the control now vested in" the municipalities. Ill. Rev. Stat. 1987, ch. 134, par. 20.

The "control now vested" in municipalities with respect to use of public streets is set forth in the Illinois Constitution (Ill. Const. 1970, art. VII, §6) and the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 11—80—1 *et seq.*). One of the municipalities in the case at bar, Arlington Heights, is a home rule unit that is granted the "power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax." (Ill. Const. 1970, art. VII, §6(a).) These "[p]owers *** of home rule units shall be construed liberally." (Ill. Const. 1970, art. VII, §6(m); see generally *City of Carbondale v. Yehling* (1983), 96 Ill. 2d 495, 451 N.E.2d 837; *County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 389 N.E.2d 553.) The remaining defendant-municipalities, which are non-home-rule units, are accorded the power to "regulate the use of the streets and other

municipal property." (Ill. Rev. Stat. 1987, ch. 24, par. 11—80—2; see also *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, 39 N.E.2d 26 (power to regulate includes power to prohibit).) They are also expressly granted the authority to "prevent and remove encroachments or obstructions upon the streets." (Ill. Rev. Stat. 1987, ch. 24, par. 11—80—3.) Based upon these principles, the municipalities in the case at bar are granted the power to regulate, and prohibit, use of public streets by a public utility.

Under Illinois statutory law, all municipalities are specifically granted the power to charge a tax upon the gross receipts of public utility telecommunication companies when those receipts derive from service originating within the municipality. (Ill. Rev. Stat. 1987, ch. 24, par. 8—11—2.) The municipal power to charge such a tax is explicitly stated to have no limiting effect upon the municipal authority to charge a franchise fee for a public utility's use of the municipalities' public streets:

> "The corporate authorities of any municipality may tax any or all of the following occupations or privileges:
>
> 1. Persons engaged in the business of transmitting messages by means of electricity, at a rate not to exceed 5% of the gross receipts from such business originating within the corporate limits of the municipality.
>
> * * *
>
> *Any of the taxes enumerated in this section may be in addition to the payment of money, or value of products or services furnished to the municipality by the [public utility] as compensation for the use of its streets, alleys, or other public places, or installation and maintenance therein, thereon or thereunder of poles, wires, pipes or other equipment used in the operation of the [public utility's] business."* (Emphasis added.) Ill. Rev. Stat. 1987, ch. 24, par. 8—11—2.

These constitutional and statutory enactments demonstrate that the municipalities possess the power to regulate, and to prohibit, AT&T's use of public streets. They also establish the municipalities' authority to charge a reasonable franchise fee for AT&T's use of public streets.

The municipal power to prohibit a public utility's use of public streets pending imposition of a franchise fee derives from Illinois Supreme Court precedent. Originally, in *Chicago Motor Coach Co. v. City of Chicago* (1929), 337 Ill. 200, 169 N.E. 22, the supreme court held invalid a municipal ordinance that required a franchise agreement with the municipality before busses of a public utility would be

permitted upon the municipality's public streets. The supreme court in *Chicago Motor Coach* concluded that the municipality could not prohibit a public utility's access to public streets pending the execution of a franchise agreement.

The supreme court's decision in *Chicago Motor Coach* was overruled in *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, 39 N.E.2d 26. In *Geneseo*, the court explicitly held that the municipal authority "to regulate and control the use of their streets *** include[s] the right to grant to or to withhold that use from [public] utilities." (*Geneseo*, 378 Ill. at 520.) The court noted that "[t]his power has been sustained since the passage of the Public Utilities act[ ] [citations]" (*Geneseo*, 378 Ill. at 520), which does not "tak[e] from the city the 'right to permit * * * or prohibit the use of any street, alley or public place within a city.' " (*Geneseo*, 378 Ill. at 521.) The court has also held that a municipality possesses the power to charge a reasonable franchise fee for a public utility's use of public streets within the municipality's control. (*Geneseo*, 378 Ill. at 522-23; see also *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324, 116 N.E. 631; *People ex rel. Shallberg v. Central Union Telephone Co.* (1908), 232 Ill. 260, 83 N.E. 829; see also *Coles-Moultrie Electric Cooperative v. Illinois Commerce Comm'n* (1985), 131 Ill. App. 3d 946, 476 N.E.2d 1303; *Diginet v. Western Union ATS, Inc.* (N.D. Ill. 1991), ___ F. Supp. ___; see generally 12 E. McQuillen, The Law of Municipal Corporations §34.37, at 128 (3d ed. 1986).) The court determined that "the power vested in cities to permit or refuse a license or franchise to a public utility has not been repealed by the provisions of the Public Utilities act, and anything said to the contrary in *** *Chicago Motor Coach* *** is not adhered to." *Geneseo*, 378 Ill. at 530.

Based upon *Geneseo*, the Illinois Supreme Court has observed that:

> "[*Chicago Motor Coach*] involved the power of the city to prohibit the operation of the company's busses. It has been regarded as holding *** that the Public Utilities Act had so occupied the field as to repeal the right of a municipality to grant or deny permission to utilities to use its streets ***. (See: *City of Geneseo v. Illinois Northern Utilities Co.*, 378 Ill. 506, 518[, 39 N.E.2d 26].) [This] *** proposition[ ] was expressly overruled in the *City of Geneseo case*." (*City of Peoria v. Peoria Transit Lines* (1957), 11 Ill. 2d 520, 522-23, 144 N.E.2d 607.)

Thus, under binding Illinois Supreme Court precedent, the municipalities retain the right to grant or deny permission to a public utility,

such as AT&T, to use the public streets within the municipalities' control pending the execution of a franchise agreement.

The majority undertakes a misguided analysis with regard to the municipalities' right to charge a franchise fee for AT&T's use of public streets. The majority initially determines that "a municipality does not have an *absolute* right to require a franchise agreement as a precondition for the use of public streets by a telecommunications utility." (Emphasis added.) (216 Ill. App. 3d at 481.) Thereafter, the majority finds that a public utility's receipt of an Illinois Commerce Commission certificate of public convenience and necessity (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 8—406) completely overrides the municipal power to prohibit a public utility's use of public streets. (216 Ill. App. 3d at 480.) On this basis, the majority concludes that "a municipality's 'consent is [only] for the purpose of notifying the municipality in advance of intended construction so that it can exercise its regulatory power of time, manner, and location of the construction.' [Citation.]" 216 Ill. App. 3d at 482-83, quoting *Arlington Heights*, 174 Ill. App. 3d at 386.

To reach its erroneous conclusion, the majority misconstrues the Telegraph Act and the Telephone Company Act. According to the majority, these Acts " 'clearly show[ ] that defendants' consent is not mandatory before access to the streets *** can be obtained. [Citation.] Section 4 of the Telegraph Act expressly authorizes the telephone company to install its facilities when it is necessary.' " (216 Ill. App. 3d at 480, quoting *Arlington Heights*, 174 Ill. App. 3d at 385.) However, contrary to the majority's interpretation, the Acts *do* require the municipalities' prior consent to AT&T's use of public streets. Moreover, section 4 of the Telegraph Act does not authorize the telephone company to install its facilities "when it is necessary," without regard to municipal consent to such use. (Ill. Rev. Stat. 1987, ch. 134, par. 4.) In addition, section 4 of the Telephone Company Act, which grants public utilities the authority to exercise eminent domain powers over private property, does not vest in public utilities the unilateral right to use public streets without the prior consent of the municipality. Ill. Rev. Stat. 1987, ch. 134, par. 20.

The majority's disposition in the instant cause is also founded upon a misinterpretation of the scope of municipal powers. For example, the majority posits that the municipal authority to "permit the use of public streets *** must be strictly construed" and is simply "regulatory in character." (216 Ill. App. 3d at 480, citing *Arlington Heights*, 174 Ill. App. 3d at 387.) The majority neglects to recognize that the powers of Arlington Heights, which is a home rule unit,

should be broadly construed. (Ill. Const. 1970, art. VII, §6(m); see generally *City of Carbondale v. Yehling* (1983), 96 Ill. 2d 495, 451 N.E.2d 837; *County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 389 N.E.2d 553.) The majority also ignores that the non-home-rule units' power to regulate use of their public streets includes the power to prohibit such use. See *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, 39 N.E.2d 26.

The majority also errs in its application of Illinois Supreme Court precedent. The majority improperly relies upon supreme court decisions pertaining to the power of a municipality to impose a tax upon a public utility's gross receipts or a municipality's power to license for revenue. (See 216 Ill. App. 3d at 481, discussing *City of Chicago Heights v. Public Service Co.* (1951), 408 Ill. 604; *City of Chicago Heights v. Public Service Co.* (1951), 408 Ill. 310; *City of Chicago Heights v. Western Union Telegraph Co.* (1950), 406 Ill. 428; see also *Village of Lombard v. Illinois Bell Telephone Co.* (1950), 405 Ill. 209, 90 N.E.2d 105; see generally Ill. Const. 1970, art. VII, §6(e)(2) (municipality has "only the power that the General Assembly may provide by law *** to license for revenue").) However, the municipalities in the case at bar argue that the franchise fees were premised upon the municipal power to regulate use of public streets, not on the municipal authority to tax, or to license for revenue. Consequently, the decisions relied upon by the majority are inapplicable to the case at bar, and do not lend support to the majority's position.

The majority misreads the Illinois Supreme Court's decision in *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, 39 N.E.2d 26. According to the majority, the *Geneseo* court "held that the powers granted to the Illinois Commerce Commission by the Public Utilities Act [citation] do not deprive municipalities of *regulatory* authority over the use of streets by public utilities. [Citation.]" (Emphasis added.) (216 Ill. App. 3d at 486.) However, the court in *Geneseo* also held that the Public Utilities Act did not deprive municipalities of *prohibitory* powers over a public utility's use of public streets. (*Geneseo*, 378 Ill. at 520-21.) In addition, the *Geneseo* court overruled its previous decision in *Chicago Motor Coach Co. v. City of Chicago* (1929), 337 Ill. 200, 169 N.E. 22, in which the court had held that municipalities do not possess the authority to prohibit a public utility's use of public streets pending execution of a franchise agreement. (See *City of Peoria v. Peoria Transit Lines, Inc.* (1957), 11 Ill. 2d 520, 144 N.E.2d 607.) The majority's analysis fails to take into account the *Geneseo* holding in light of the Illinois Supreme Court's decisions in *Chicago Motor Coach* and *City of Peoria*. In addition, *Geneseo* and

*City of Peoria* are directly contrary to the conclusion the majority adopts in this appeal.

The majority's determination is also unsupported by its earlier decision in *American Telephone & Telegraph Co. v. Village of Arlington Heights* (1988), 174 Ill. App. 3d 381, 528 N.E.2d 1000 (hereinafter *Arlington Heights I*), which pertained to the trial court's allowance of AT&T's motion for a preliminary injunction. In a patent *non sequitur*, the majority states that "insofar as this court went beyond determining whether the trial court abused its discretion, its findings are valid because they are relevant with respect to the question of whether plaintiffs are ultimately likely to prevail on the merits." (216 Ill. App. 3d at 479.) However, it is well established that disposition of an appeal from preliminary injunctive relief is not, *and cannot be*, a ruling on the underlying merits of the parties' dispute. (See, *e.g., Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 483 N.E.2d 1271.) I cannot accept the majority's determination that *Arlington Heights I* is controlling in the instant appeal.

I also find it significant that AT&T has recognized the municipal power to charge a reasonable franchise fee, and has entered into numerous franchise arrangements with other municipalities pertaining to the passage of AT&T's fiber optic cable under public streets. The municipalities in the instant cause relied upon the existence of AT&T's franchise agreements with other municipalities as justification for the municipalities' position that they would not consent to AT&T's use of their public streets until negotiation of a franchise agreement between AT&T and the municipalities involved in the instant appeal. Although AT&T initially insisted that it had no legal obligation to pay a franchise fee to the municipalities in the case at bar, AT&T later suggested that it would pay the municipalities $1 per linear foot for its use of their public streets.

The franchise agreements that AT&T has executed with municipalities, other than those involved in the instant cause, require the payment of at least $1.00 per linear foot. The record shows that, in aggregate, these fees amount to millions of dollars per year. It cannot be seriously argued that AT&T would have agreed to pay these franchise fees to other municipalities if the fees were not legally valid. AT&T's payment of such franchise fees to other municipalities is not gratuitous or in the nature of charitable contributions to those municipalities. AT&T has observed that still other municipalities have not demanded a franchise fee or franchise agreement for the passage of fiber optic cable under the municipalities' public streets. However, the circumstance that one municipality chose not to charge a franchise fee

for a public utility's use of public streets does not infringe upon the legal right of another municipality to require a reasonable franchise fee if it so chooses.

In light of these considerations, I conclude that the municipalities possess the lawful authority to prohibit AT&T's use of public streets pending negotiation of a franchise agreement for such use.

## II

The majority also erroneously determines that the entry of a permanent injunction was appropriate, because the municipalities "attempted to charge plaintiffs millions of dollars in franchise fees [that bear] no reasonable relationship to the minimal burdens which plaintiffs have imposed upon defendants by running their cable underneath short segments of defendants' streets." 216 Ill. App. 3d at 484.

However, the majority addresses the wrong question. The proper inquiry is not whether the proposed franchise fees were excessive, but whether the municipalities were arbitrary and capricious when they refused to consent to AT&T's use of public streets until negotiation of a franchise agreement. It is well established that a municipality may not exercise its authority in an arbitrary and capricious fashion. See, e.g., *Chicago National Bank v. City of Chicago Heights* (1958), 14 Ill. 2d 135, 150 N.E.2d 827.

In my opinion, the municipalities here were not arbitrary or capricious. The record indicates that the failure to reach an early accord with respect to a franchise fee was precipitated in large part by AT&T's refusal to pay *any* franchise fee whatsoever to the municipalities. There is no legal requirement that a municipality consent to a public utility's use of public streets according to the time frame unilaterally dictated by the public utility's intended date of operation. Under these circumstances, the municipalities' failure to consent to AT&T's use of public streets cannot be fairly characterized as arbitrary and capricious.

## III

I find the majority's resolution of the instant appeal ill-advised, because it nullifies both the municipal authority to regulate a public utility's use of public streets and the municipal power to charge a franchise fee for such use. The majority now permits a public utility to unilaterally extend its power of eminent domain over private property (see Ill. Rev. Stat. 1987, ch. 134, par. 20) to include public property within a municipality's control. The majority also allows a public utility's exercise of this expanded eminent domain power without any

consent by or payment of any franchise fee whatsoever to the municipality having control of the public property. This disposition is contrary to Illinois statutory law and Illinois Supreme Court precedent, and is not justified by the majority's previous ruling in *Arlington Heights I*. I am unable to accept the majority's sweeping rules in the instant cause.

In addition, the majority's disposition needlessly entangles the court in inherently municipal affairs. The majority tacitly condones AT&T's refusal to negotiate any franchise agreement at all. In place of such negotiation, the majority allows AT&T to obtain a judicial determination of whether the various proposed and nonbinding franchise fees suggested by the municipalities were reasonable. As this court recognized in *Arlington Heights I*, the imposition of a franchise fee for use of public streets is an inherently legislative function of the municipalities, and whether a particular franchise fee arrangement should be imposed is, in the first instance, a matter within the province of the municipalities and their residents. (*Arlington Heights*, 174 Ill. App. 3d at 388.) This court is certainly not the proper forum to debate the relative merits of the various franchise arrangements offered by the municipalities. I cannot condone the majority's unjustified intrusion into a dispute that should be resolved by the residents of the municipalities through their elected officials.

In view of the foregoing considerations, I respectfully dissent.