DIGINET, INCORPORATED, Plaintiff,

v.

WESTERN UNION ATS, INCORPO-RATED, Defendant, Third–Par-ty–Defendant–Appellant,

v.

CITY OF CHICAGO, Defendant, Third–Party–Plaintiff–Appellee.

No. 91–1658.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1992.

Decided March 9, 1992.

Rehearing and Rehearing En Banc Denied March 17, 1992.

1390

Don Sampen, Jacob J. Meister, Chicago, Ill., for Diginet, Inc.

Thomas F. Geselbracht (argued), John E. Mitchell, Peter S. Lubin, Rudnick & Wolfe, Chicago, Ill., Patricia N. Young, Washington, D.C., for Western Union ATS, Inc.

Ruth M. Moscovitch, Asst. Corp. Counsel, Office of the Corp. Counsel, Appeals Div., Lawrence Rosenthal, Deputy Corp. Counsel (argued), Emily Nicklin, Bennett W. Lasko, Stuart D. Fullerton, Office of the Corp. Counsel, Lynn K. Mitchell, Kelly R. Welsh, Asst. Corp. Counsel, Benna R. Solomon, Office of the Corp. Counsel, Appeals Div., Chicago, Ill., for City of Chicago.

Howard J. Trienens, Gerald A. Ambrose (argued), Sidley & Austin, Chicago, Ill., for American Tel. & Tel. Co. and AT & T Communications, Inc.

Before POSNER, EASTERBROOK, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

This appeal from the grant of a preliminary injunction to a city that wants to tax a telecommunications company raises difficult questions concerning res judicata, equitable remedies, municipal powers, certification of questions of state law by federal courts to state courts, and management of complex litigation.

Beginning in 1981, Western Union, in an effort to diversify away from its moribund telegram business, built a fiber optic network in major cities, including Chicago. All sixteen miles of the network in Chicago were laid in underground ducts that, like the city streets, are "public ways" owned by the City—they are the same ducts that carry conventional telephone lines, coaxial cables for cable television, and other electrical wires. Western Union's fiber optic network, called "ATS" (short for "Advanced Transmission Systems"), was to be used to connect high-volume telephone customers directly with long-distance carriers such as AT & T and MCI, bypassing the local telephone exchanges. Such a service is not subject to common carrier regulation by either the Federal Communications Commission or its state counterpart, the Illinois Commerce Commission. It is a free-market service.

Western Union was violating no law in installing its fiber optic cables in the ducts and had obtained the necessary permits from the Department of Public Works of the City of Chicago. Higher officials of the City, however, when they discovered the installation in 1986, decided not to permit Western Union to activate the network unless Western Union agreed to pay the city a franchise fee of 3 percent of the network's revenues or so much per foot— whichever would generate more revenue for the City. To back up this demand, the City has since passed an ordinance forbidding the installation or maintenance of any subsurface cables without municipal autho-

rization. Chi.Munic.Code § 10–28–010. There is no pretense that the franchise fee is necessary to offset such costs as the fiber optic network may impose on the city; so far as appears, it imposes no costs, congestion or otherwise. The purpose of the fee is to raise revenue for the city, which is why we are calling the fee a tax. While claiming that Western Union could not operate the fiber optic network without obtaining a municipal franchise agreement conditioned on paying the tax, the City took no steps to prevent Western Union from putting the network into service, and it did so.

. With matters at an impasse, in 1988 Western Union brought suit in an Illinois state court to enjoin the City from attempting to condition permission to operate the network on the payment of a tax. *Western Union Corp. v. Parrish*, No. 88 Ch. 9963 (Ill.Cir.Ct.). It based the suit on the Illinois Telephone and Telegraph Act, Ill.Rev.Stat. ch. 134, ¶¶ 1–21, which in ¶ 20 authorizes a telephone company upon ten days' written notice. to install its lines in public ways (though whether this provision applies to cities is in dispute, as we shall see), and on the absence of express authority for Illinois municipalities to tax users of public ways. The trial judge entered a temporary injunction against the City; he called it a temporary restraining order, but as it continued well beyond the ten or at most (save perhaps in exceptional circumstances) twenty days that such an order when made by a federal court is permitted to remain in effect, it quickly became what federal judges would call a temporary or preliminary injunction. Fed.R.Civ.P. 65(b); *Sampson v. Murray*, 415 U.S. 61, 85–88, 94 S.Ct. 937, 950–52, 39 L.Ed.2d 166 (1974); 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2953 (1973). In 1990, with the "temporary restraining order" still in force, the trial on the merits completed, and the case awaiting decision by the judge, Western Union sold the entire ATS system to MCI, which formed a subsidiary to own the system, Western Union ATS, Inc. In the sale agreement Western Union warranted that it was in compliance with all laws, regulations, decrees, etc. connected with the ATS systems, but it excepted from this warranty the dispute with Chicago that was the subject of the *Parrish* litigation.

Naturally, after selling the ATS system to MCI, Western Union lost interest in the *Parrish* suit and decided to abandon it. To its motion to dismiss the suit the City responded with a motion to add Western Union ATS (that is, MCI's subsidiary, which in the remainder of this opinion we shall call simply "ATS") as a plaintiff. ATS's lawyer was present at the hearing on Western Union's motion to dismiss but said nothing, his client not having filed an appearance in the litigation. After the City's lawyer told the judge that "there is no dispute in this litigation as between ATS and either the City or ... anybody else," even though the City knew that ATS was operating the fiber optic network and wanted to expand it, the judge asked the City's lawyer whether he wanted an order prohibiting ATS from expanding. He replied: "No, not at this point. We are negotiating with them, but, no, we are not seeking an order." The judge denied the motion to add ATS as a plaintiff and dismissed Western Union's suit with prejudice. But the negotiations between the City and ATS went nowhere.

One of ATS's customers, Diginet, Inc., had leased some of the circuits in the ATS network in Chicago. The City notified Diginet that ATS had no authority to make such a lease. On the strength of this notice, Diginet withheld lease payments that it owed ATS, which in turn threatened to cancel the lease, precipitating this diversity suit by Diginet against ATS and the City for a declaration of its rights vis-à-vis the two defendants. That dispute remains unresolved. But the City filed a cross-claim against ATS under Fed.R.Civ.P. 14(a), and asked for a preliminary injunction against ATS's expanding its network in Chicago without obtaining a municipal franchise. The district judge granted the injunction, 759 F.Supp. 1285 (N.D.Ill.1991), and ATS appeals under 28 U.S.C. § 1292(a)(1).

■ The right to a preliminary injunction depends on a comparison of the likely harms to the parties (and to others as well, if others' rights or interests are affected) if

such interim relief is granted or denied and on a tentative evaluation of the merits. The relevant harms are the *irreparable* ones, because a harm that will be cured by the entry of the final judgment supplies no reason for interim relief. Harms and merits are related inversely from the standpoint of whether to grant a preliminary injunction. The greater the harm to the plaintiff if the injunction is denied, the less of a showing that his case has merit need he make to get the injunction; the less the harm, the stronger the required showing of merit. And conversely for the defendant: the greater the harm to him if the injunction is granted, the less of a case on the merits need he make to defeat the plaintiff's motion. *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593–94 (7th Cir.1986); *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168, 170 (7th Cir.1988); *Ping v. National Education Ass'n*, 870 F.2d 1369, 1371–72 (7th Cir.1989).

■ The weighing of these factors is for the district judge in the first instance, subject to light review by us, *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1097 (7th Cir.1988), but in this case the judge focused on the merits to the neglect of the balance of harms, and as a result overlooked the fact that the City had made no showing that it would sustain *any* harm if a preliminary injunction were denied. It is not as if the City *wants* to keep ATS from expanding its optic fiber network. All it wants is tax revenues, and as the tax it wishes to impose is proportioned to the size and revenue of the network, the bigger and more lucrative that network is the higher the City's tax revenues will be. ATS has conceded, moreover, that if it loses this lawsuit it will owe the City the tax on any new lines from the time they are built.

There is no argument that this expansion would crowd out other users of the underground ducts or impose any other form of cost either on them or on the City itself. The district judge did express some concern on this score, but the City has abandoned the point in this court. It does claim to want a franchise agreement that will require "the purchase of sufficient insurance by a fiber optic company in case of damage due to the occupation of the public ways, annual inspection rights by the City and financial and engineering audits if needed," but it doesn't need a franchise agreement or any other form of agreement in order to impose these and other reasonable regulatory controls on users of the public ways. Remember that the Department of Public Works granted Western Union a permit. The only basis on which the City seeks to revoke the permit is that it wants to tax the ATS system.

■ At argument the City's lawyer reminded us that a landowner is entitled to an injunction against a trespasser without any proof that the trespass is inflicting harm upon him. *Okaw Drainage District v. National Distillers & Chemical Corp.*, 882 F.2d 1241, 1246 (7th Cir.1989). There are two confusions here. One is between a permanent and a temporary injunction. A landowner may have a right to a permanent injunction upon proving that the defendant is trespassing on its land, but until this proof is made the landowner has no such right. His right to temporary relief in the meantime will depend on his satisfying the criteria for such relief, which include considerations of harm. The second confusion arises from the fact that the City doesn't want to keep the defendant off its ground (or rather underground). It just wants, as we have said, to tax the defendant. And the defendant is perfectly willing to pay the tax, retroactively to the day imposed, as soon as its obligation to do so is authoritatively determined. The City does not argue that the dissolution of the temporary injunction would "harm" it by depriving it of a useful bargaining tool; and the purely strategic advantages of preliminary relief deserve no consideration by a court in deciding whether to grant it, if only because the harm to one party of being deprived of a bargaining advantage will be balanced by the harm to the other of having to bargain at a disadvantage.

■ Putting strategic considerations aside, we can see that the City has actually been hurt by the grant of the preliminary injunction. The injunction has deprived it

of the additional tax revenues that it would obtain if ATS had a larger and more profitable system and the City were adjudged to be entitled to tax the company retroactively. And there is no offsetting harm, as there would be if the expansion of the fiber optic network would crowd or otherwise harm other users of the underground duct system. We have the unusual case in which the harm to the plaintiff from refusing a preliminary injunction would actually be negative.

But the harm to the defendant, ATS, from the grant of the injunction, and to the larger public, was positive and possibly substantial. And irreparable. This is true even if the profits that ATS has lost as a result of not being able to expand its system while the injunction is in force could be estimated with tolerable accuracy, and even if the City had been required to post an injunction bond under Fed.R.Civ.P. 65(c) commensurate with that estimate. The City was required to post only a $5,000 injunction bond, and we have held that the amount of the bond places a ceiling on the damages that a defendant can obtain for the wrongful grant of an injunction, unless the plaintiff was acting in bad faith. *Coyne–Delany Co. v. Capital Development Board*, 717 F.2d 385, 393–94 (7th Cir.1983); *International Ass'n of Machinists v. Eastern Airlines, Inc.*, 925 F.2d 6, 10 (1st Cir.1991). Maybe the City waived this rule when it asked "that a bond or security be waived because of its ability to satisfy judgments of [the] court." Cf. *Dillon v. City of Chicago*, 866 F.2d 902 (7th Cir.1988). We need not decide. The bond is a side issue. Suppose it had been for $10 million and ATS could prove its loss from the injunction to the penny: $9,987,456.87. The loss consequent upon the delay in the expansion of the fiber optic network would not be eliminated. ATS would be whole, but the public that consists of the potential customers for the expanded system would not be. Their access to a preferred service has been delayed, and they will never be compensated for the delay. The preliminary injunction is injuring ATS's customers to no one's advantage including the City's. *American Tel. & Tel. Co. v. Village of*

*Arlington Heights*, 174 Ill.App.3d 381, 388, 124 Ill.Dec. 109, 113, 528 N.E.2d 1000, 1004 (1988); *City of Rock Island v. Central Union Tel. Co.*, 132 Ill.App. 248, 260–61 (1907).

Given the exceptionally one-sided balance of harms, it is plain that the injunction should not have been issued, regardless of the likely merits of the City's claim. We could stop here, but to do so would disserve the cause of efficient judicial administration. If the City's right to tax ATS is clear, no practical purpose would be served by instructing the district court to vacate the preliminary injunction; on the contrary, upholding the injunction on the ground that the City's legal position was correct would induce ATS to give up a now hopeless lawsuit, to agree to pay the City's tax, and in turn to be allowed to expand its system. When the appeal from a preliminary injunction brings up dispositive issues of law that can be decided without a trial, the sensible course is to convert the preliminary-injunction proceeding into a permanent-injunction proceeding and go directly to the merits. We have done this frequently. Recent examples include *Dimeo v. Griffin*, 943 F.2d 679, 681 (7th Cir.1991) (en banc); *Illinois Council on Long Term Care v. Bradley*, 957 F.2d 305, 309–10 (7th Cir.1992); *Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325, 329 (7th Cir.1991), and *Cronin v. United States Department of Agriculture*, 919 F.2d 439, 445 (7th Cir.1990). We shall do it here.

The City makes three arguments in favor of its power to tax ATS: the dismissal of the *Parrish* suit with prejudice binds ATS, even though ATS wasn't a party to that suit; ATS is not a telephone company and therefore cannot invoke the Illinois Telephone and Telegraph Act, which in any event (the City further argues) does not curtail a municipality's taxing powers; and an Illinois municipality can tax users of its public ways. The district court rejected the first argument but accepted the others, thus in effect predicting that the Supreme Court of Illinois would reverse *American Tel. & Tel. Co. v. Village of Arlington*

*Heights*, 216 Ill.App.3d 474, 160 Ill.Dec. 30, 576 N.E.2d 984 (1991)—which had held that Illinois municipalities do not have power to tax users of their public ways—if it got a chance. It has got a chance. For on October 2 of last year, after the appeal in our case was filed but before it was argued, the supreme court granted leave to the Village of Arlington Heights to appeal.

■■■ All three arguments made by the City of Chicago in defense of the judgment of the district court present issues exclusively of state law. And one of the arguments (the third), plus part of another (the second), are about to be made to the Supreme Court of Illinois in the *Arlington Heights* case. So what is this case doing in federal court? Shouldn't we use our authority under Circuit Rule 52 and Illinois Supreme Court Rule 20 to certify these state law questions to that court?

We think not. Both the question of res judicata and the question whether ATS is a telephone company are fact-laden and particularistic. They may never recur, and (as will become apparent) they lack broad, general significance. Such questions are not suitable for certification to a state's highest court. *Motor Vehicle Casualty Co. v. Atlantic National Ins. Co.*, 374 F.2d 601, 602 n. 1 (5th Cir.1967); 17A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4248, at pp. 173–74 (1988); compare *Retail Software Services, Inc. v. Lashlee*, 838 F.2d 661, 662 (2d Cir.1988) (per curiam); *Barnes v. Atlantic & Pacific Life Ins. Co.*, 514 F.2d 704, 706 (5th Cir.1975); *Hume v. Hertz Corp.*, 628 F.Supp. 763, 767 (D.Conn. 1986). The question of a municipality's power to tax users of its public ways, and the question how that power may or may not be curtailed by the Telephone and Telegraph Act, are ones of broad, general significance, are not fact-laden, and ordinarily would be eminently suitable for certification. Ordinarily. But here both questions are already before the state supreme court, in a case to be argued in two weeks. It is probably too late to consolidate a certified question in our case with the appeal in *Arlington Heights*, and anyway

what purpose would be served by having the same issue briefed and perhaps argued by two sets of lawyers? The lawyers in our case could have submitted (we believe did submit) amicus briefs in *Arlington Heights* if they mistrusted the abilities of their counterparts in that case.

■■■ What would make no sense would be for us to resolve the issue with finality only to discover to the immense harm of one of the parties that we had guessed wrong about Illinois law. But a wrong guess could do no harm here. If we dissolve the preliminary injunction, the case will remain in the district court, no doubt to be stayed until *Arlington Heights* is decided, and then decided consistently with that decision. Only if *Arlington Heights* should be disposed of without a resolution of the issue of municipal taxing powers—which of course is possible, if only because the parties to that case may settle before the supreme court decides it—would our resolution be the final one. As it should be, in that event, to head off a further appeal.

■■■ Some federal judges are timid about deciding issues of state law, because they fear that by doing so they will confuse that law. The fear is groundless. State courts are not bound by federal courts' interpretations of state law. A state judge will give such interpretations no more weight than their persuasiveness earns them. And this is not a case in which the party seeking an answer to difficult questions of state law has wormed his way into federal court in some questionable manner that should make us feel that we are being dragged gratuitously into the middle of a dispute that belongs in state court. Diginet, a Nevada company, brought ATS and the City into federal court, and the considerations of judicial economy that underlie Rule 14 of the Federal Rules of Civil Procedure entitled the City to use Diginet's indisputably proper invocation of the diversity jurisdiction to maintain the City's dispute with ATS in the same court. The City didn't have to file a cross-claim in this litigation, as it would have had to do were its claim not a cross-claim but a compulsory

counterclaim. *Answering Service, Inc. v. Egan,* 728 F.2d 1500, 1503 (D.C.Cir.1984). It does seem odd that the City should prefer to litigate questions of its own state's law in a federal court rather than in a presumably friendlier state court. But that is its prerogative. As a matter of fact neither party asked us to certify any of the issues in this appeal to the Supreme Court of Illinois, even after that court granted leave to appeal in the *Arlington Heights* case. If the City of Chicago is content to have us interpret Illinois state law, in a case indisputably within our jurisdiction, we have no reason to be shy about doing just that. *Stamp v. Insurance Co. of North America,* 908 F.2d 1375, 1379 (7th Cir.1990).

So on to the merits, beginning with res judicata. We must give the same effect in this litigation to the *Parrish* judgment as an Illinois state court would do. 28 U.S.C. § 1738; *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380–81, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985). We may assume that the two cases involve a single dispute—the dispute over the taxability by the City of Chicago of the ATS network in the City's underground ducts. But more is required for a judgment to bar relitigation. The party sought to be barred must either have been a party to the previous litigation, which ATS was not, or be in privity with that party, which the City contends ATS is. *Bonanno v. La Salle & Bureau County R.R.,* 87 Ill.App.3d 988, 993–94, 42 Ill.Dec. 866, 869–70, 409 N.E.2d 481, 484–85 (1980). If the City is right, we are unclear why it moved in the *Parrish* litigation to add ATS as a party, but maybe it was just trying to make assurance doubly sure.

Suppose X brings suit against Y, a squatter, to evict him, and obtains an order of eviction. Y gives a quitclaim deed to the premises to Z, who turns around and sues X for a declaration that he (Z) has a right to remain on the premises. A suit so offensive to the policy of res judicata would be barred by the simple observation that, by virtue of the judgment, Y has no right of occupancy to convey to Z, so Z has no right

of occupancy that he can assert against X. 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4462, at p. 550 (1981); cf. *Guerrero v. Katzen,* 774 F.2d 506, 509 (D.C.Cir.1985). The issue becomes more difficult when the delivery of the quitclaim deed precedes the judgment, but the rule is that if the lawsuit had already been filed and the recipient of the deed knew about it, he is bound by the judgment. 18 Wright, Miller & Cooper, *supra,* at 555–56. He could easily take his transferor's place in the lawsuit, and such a substitution is better than having two lawsuits.

But this assumes that the transferee's rights derive entirely from the transferor, so that if the latter (Y in our example) had no rights, neither can the former (Z). *Id.* at 557–59. If the assumption fails, so does the defense of res judicata. If a person were adjudicated to be ineligible to practice law in Illinois, it would not follow that the person to whom he sold his practice would also be ineligible. The dispute in this case is not over who owns the fiber optic network, for no one doubts that ATS does. It is over the right to conduct business over the network on particular terms. Western Union might lack the right, yet ATS have it. Since Western Union's case was never adjudicated, we do not know whether it might have lost on a ground inapplicable to ATS.

There is a reason it was never adjudicated. Although Western Union had done well in the initial stages and had obtained a temporary injunction, once it sold the fiber optic network it saw no point in continuing the litigation. Anticipating the same dispute with the buyer as with the seller, the City sensibly moved to join ATS as a party. The motion was denied. The City could have appealed, but did not. On the contrary, its lawyer told the trial court that the City had no present dispute with ATS and didn't want an injunction against it. Had he not said that, ATS might have dropped its opposition to being joined in the suit and have picked up the ball dropped by Western Union—especially once it realized that the judge meant to dismiss the suit with prejudice.

Given the doubts about whether ATS was in privity with Western Union, the City's conduct at the hearing was likely to lull ATS into thinking that it had nothing to fear from a dismissal of the *Parrish* litigation with prejudice, and if so that conduct may bar the City from changing its position and arguing that it really did have a dispute with ATS, after all. Recognized in Illinois, *Giannini v. First National Bank*, 136 Ill.App.3d 971, 983, 91 Ill.Dec. 438, 449, 483 N.E.2d 924, 935 (1985), the doctrine of judicial estoppel prevents "intentional self-contradiction" from "being used as a means of obtaining unfair advantage" in litigation. *Scarano v. Central R.R.*, 203 F.2d 510, 513 (3d Cir.1953), quoted in *In re Cassidy*, 892 F.2d 637, 641 (7th Cir.1990). See also *Eagle Foundation, Inc. v. Dole*, 813 F.2d 798, 810 (7th Cir. 1987). Admittedly the contours and even purpose of the doctrine are fuzzy, but its core is the proposition that a party may not use inconsistent positions to win two judgments arising from the same claim. *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1547–48 (7th Cir.1990). That is a plausible characterization of what the City would be doing if it could get Western Union's claim *and* ATS's claim both dismissed (with prejudice) by taking inconsistent positions on whether ATS was effectively a party to the *Parrish* litigation.

An innocent construction can be placed on the City's behavior—that it was negotiating with ATS in good faith and didn't want to poison the negotiation by asking for an injunction. If it were certain that ATS was in privity with Western Union, it would be unclear whether the City or ATS were more to blame for the failure to resolve ATS's liability in the *Parrish* litigation. But doubt about privity, the City's representations, and the unexpectedness of the judge's deciding to dismiss the suit with prejudice persuade us that an Illinois court would not hold that the judgment in *Parrish* barred ATS from defending on the merits against the City's cross-claim in this suit.

We shall now consider whether ATS is a telephone company within the meaning of the Illinois Telephone and Telegraph Act. If it is, then, at least on ATS's interpretation of the Act, ATS had the right upon ten days' written notice (which it gave) to run its lines in the City's duct system; but it may still have to pay tax, as the City argues. If ATS is not a telephone company, then it has no legal right *granted by the Act* to use the ducts, but there would still be a question whether the City was authorized to prevent it from doing so or, more precisely, to use the power of exclusion as the lever for imposing a tax on a use of a public way. The two "buts" suggest that the question whether ATS is a telephone company may not be as vital as the parties think, but we shall soldier on regardless.

Although ATS's charter does not mention the telephone business, it authorizes the corporation to engage in "all lawful business," which obviously includes that of a telephone company, broadly defined in the Act as any company with the power "to construct or operate telephone lines or exchanges." Ill.Rev.Stat. ch. 134, ¶ 17. Even disregarding the broad statutory definition, which clearly encompasses ATS, we should suppose, unless there were some reason to think otherwise, that a company that leased wires to firms engaged in the transmission of telephone messages was a telephone company. The only interesting difference between ATS and a "regular" telephone company like Illinois Bell is that ATS confines its business to bulk users, who have their own exchanges. It is a wholesaler, connecting those exchanges to long-distance systems. We cannot see what difference that makes from the perspective of a statute seemingly intended to facilitate prompt and economical extensions of telephone service by preventing municipalities and other local governments from using their locational monopolies to delay, and extort monopolistic fees from, companies that to provide service must frequently run wires and cables across local governmental boundaries.

We are given some pause by reflecting that the statute invests telephone compa-

nies with the power of eminent domain. Ill.Rev.Stat. ch. 134, ¶ 20. Of course that power is not involved here. But it may be questioned whether any old unregulated company that decides to go into the telephone business (now partially deregulated, opening the way for companies like ATS) should be allowed to condemn easements in private property for its rights of way, which is the implication of reading "telephone company" in the telephone company act broadly. Yet the act, passed in 1903, predates common carrier regulation in Illinois—so that when passed it authorized any company that wanted to provide telephone service to do so, and to use the public ways, and to condemn private property, all without having to obtain a certificate of public convenience and necessity or any other public license. The eminent-domain power of telephone companies was considered well settled as early as the 1880s. Wm. G. Whipple, "Some Points Ruled in Telephone Law," 22 *Central L.J.* 33, 34 (1886). It is a modern perspective that connects the power of eminent domain to the status of being a regulated common carrier or public utility.

What is true is that there was a time when a corporate charter was a special legislative grant, which might perhaps be compared to a certificate of public convenience and necessary. But that period ended in Illinois in 1872. E. Merrick Dodd, Jr., "Statutory Developments in Business Corporation Law, 1886–1936," 50 *Harv.L.Rev.* 27, 39–40 (1936). For more than thirty years, when the telephone company act was enacted, corporations had been able to engage in the telephone business in Illinois without a license.

■ The City disagrees with the policy of the telephone company act. It wants it limited to telephone companies that have a license of some sort from either the Federal Communications Commission or the Illinois Commerce Commission. But we cannot rewrite the statute on the ground that the state may have acted precipitately in 1903 in granting eminent domain powers to every telecommunications Tom, Dick, and Harry. And it may not have been precip-

itate. The law has come full circle. The deregulation movement in telecommunications makes today more like the day before yesterday (1903) than like yesterday, the heyday of regulation. So it is not clear that the relevant context of the statute has changed when we compare the period of enactment with today. Furthermore, ATS advised us at argument, without contradiction, that it is seeking a certificate of public convenience and necessity from the Illinois commission for reasons unrelated to this litigation and expects to get it shortly. Evidently one can't be a fully effective telephone company even at the wholesale, unregulated level without such a certificate. So maybe the specter of unregulated companies engaged in promiscuous condemnations is indeed spectral rather than real.

But recurring to an earlier point, we have difficulty seeing how classifying ATS as a telephone company wins the case for it. There is a serious question whether the ten-day privilege granted telephone companies that want to run their lines in public ways applies within incorporated areas, as distinct from unincorporated areas where the writ of the highway commissioners runs. The statutory text is opaque, but was interpreted in favor of the narrower interpretation in *People ex rel. Shallberg v. Central Union Tel. Co.*, 232 Ill. 260, 276, 83 N.E. 829, 833 (1908), a case laboriously and rather unpersuasively distinguished in the second *Arlington Heights* opinion. 216 Ill.App.3d at 276, 160 Ill.Dec. at 34–36, 576 N.E.2d at 988–90. Even if the ten-day privilege applies in cities, the question what fees the city may impose would remain, so let us turn to that question—the question whether Illinois municipalities may use their ownership and control of public ways to extract tax revenues from the users of those ways.

■ ATS concedes that the Telephone and Telegraph Act does not prevent (assuming it is applicable to) a municipality from regulating the use of its public ways whether they are above or below ground. Congestion is the obvious problem calling for regulation, whether it is traffic conges-

tion or a crowded utilities duct, but there are others. Regulation to solve such problems can take the form of user fees reasonably calculated to cover the cost that a given use of the public way imposes on either the municipality or the other users of the public way. *City of Peoria v. Postal Telegraph–Cable Co.,* 274 Ill. 568, 113 N.E. 968 (1916); *Sears v. City of Chicago,* 247 Ill. 204, 216, 93 N.E. 158, 161 (1910); *Bryant v. Village of Sherman,* 204 Ill. App.3d 583, 589, 149 Ill.Dec. 624, 628, 561 N.E.2d 1320, 1324 (1990). As a matter of fact, user fees are, where feasible, a more efficient technique of regulation than telling the regulated company exactly what it can and can't do, because they simulate market prices. Nor can it be denied that regulation, even—perhaps especially—when it does not take the form of user fees, is a common, albeit surreptitious, device for taxation. A regulatory agency that requires a common carrier or public utility to raise its rates to one class of users above the cost of serving them and to lower its rates to another class below the cost of serving *them* is engaged in taxation and redistribution, only by another name. Richard A. Posner, "Taxation by Regulation," 2 *Bell J.Econ. & Mgmt.Sci.* 22 (1971).

But this observation cannot carry the day for the City. The legal power to regulate is not necessarily the legal power to tax. Municipalities have—must have—broad powers of regulation, but the usual rule and the rule in Illinois is that they may not tax without explicit authority from the state. *Village of Lombard v. Illinois Bell Tel. Co.,* 405 Ill. 209, 90 N.E.2d 105 (1950); 16 *McQuillin on Municipal Corporations* § 44.05, at p. 15 (3d ed., Stephen M. Flanagan ed. 1984). They may not circumvent this limitation by calling a tax something else, such as a "franchise fee." The test is functional. If the fee is a reasonable estimate of the cost imposed by the person required to pay the fee, then it is a user fee and is within the municipality's regulatory power. If it is calculated not just to recover a cost imposed on the municipality or its residents but to generate revenues that the munici-

pality can use to offset unrelated costs or confer unrelated benefits, it is a tax, whatever its nominal designation. *City of Chicago Heights v. Western Union Telegraph Co.,* 406 Ill. 428, 94 N.E.2d 306 (1950); *Village of Lombard v. Illinois Bell Tel. Co., supra,* 405 Ill. at 218, 90 N.E.2d at 110; *American Tel. & Tel. Co. v. Village of Arlington Heights, supra,* 216 Ill. App.3d at 484, 160 Ill.Dec. at 37, 576 N.E.2d at 991. The franchise fee that the City of Chicago wants to levy on ATS is, by this test, a tax, not a user fee.

So we must ask whether the State of Illinois has given the City the power to tax users of the public ways. It has in fact authorized municipalities to levy a five percent gross receipts tax on "persons engaged in the business of transmitting messages by means of electricity," Ill.Rev.Stat. ch. 24, ¶ 8–11–2, a definition that fits ATS to a t. The parties do not tell us whether the City of Chicago taxes ATS under this provision, perhaps because the statute goes on to provide that the taxes it authorizes are in addition to any "compensation [that the municipality receives] for the use of its ... public ways." One might have expected the City to argue that the reference to compensation implies that municipalities can tax the users of their public ways. But it does not so argue and the argument would be weak—for if municipalities have that power why did the state suppose it necessary or useful to authorize such a tax explicitly and cap it at five percent?

The City cites cases that hold merely that a municipality's franchisee cannot attack conditions to which it has consented even if the city "could not have exacted many of these conditions," *Illinois Broadcasting Co. v. City of Decatur,* 96 Ill.App.2d 454, 462, 238 N.E.2d 261, 265 (1968) ("exactions agreed to ... are not exactions"); see also *City of Peoria v. Peoria Transit Lines, Inc.,* 11 Ill.2d 520, 144 N.E.2d 609 (1957), that a municipality can levy a rental fee equivalent to a tax when state legislation authorizes it to do so, as in *Broeckl v. Chicago Park District,* 131 Ill.2d 79, 83–84, 136 Ill.Dec. 106, 107–109, 544 N.E.2d 792, 793–95 (1989), and that a municipality's

ownership of public ways entitles it to regulate those ways for the benefit of the public, as in *People ex rel. Armanetti v. City of Chicago*, 415 Ill. 165, 112 N.E.2d 616 (1953). Regulate—and as we saw, a user fee can be a method of regulation—but not tax. Of course there is an important sense in which taxation can and does benefit the public, but you cannot build on that a general municipal right of taxation without destroying the principle that a municipality's taxing powers must be granted, not imputed, to it.

■ Chicago, though, enjoys "home rule," Ill. Const. art. VII, § 6(a), which broadens its powers and weakens the applicability of cases such as *Village of Lombard v. Illinois Bell Tel. Co., supra,* that base restrictions on municipal taxing powers upon the absence of an express delegation by the state. The power to tax is expressly within the home-rule grant. But the grant is limited to functions "pertaining to its [the home-rule city's] government and affairs," and this has been interpreted to mean issues of local rather than statewide concern, *People ex rel. Bernardi v. City of Highland Park*, 121 Ill.2d 1, 12–13, 117 Ill.Dec. 155, 160, 520 N.E.2d 316, 321 (1988)—which the taxing of public rights of way for telecommunications lines is not. Among examples given by the legislative committee that proposed the home-rule amendment of subjects "that do not pertain to local government and affairs ... were ceilings on billing rates for local telephone calls or interest rates on mortgage loans made within the city or county because State or Federal regulation of utility rates and credit institutions was so extensive and long standing and the interest in uniform regulation so strong as to render those functions nonlocal in character, despite the primarily local impact of the specific ordinances in question." *Kalodimos v. Village of Morton Grove*, 103 Ill.2d 483, 502, 83 Ill.Dec. 308, 316, 470 N.E.2d 266, 274 (1984). Granted, the emphasis falls—and this is even clearer in the report that the court was paraphrasing, 7 *Record of Proceedings of Sixth Illinois Constitution Convention* 1652 (1972)—on the presence of state and federal regulation, which is not a factor in our case. On the other hand, neither is the impact here purely local. If municipalities such as Chicago can use their control over the public ways to extract fees unrelated to costs from telephone and other right of way companies, the provision of telephone and other utility-type services may be disrupted. To run a cable across the state a telephone company might have to cross a hundred municipal boundaries, and at each one—if the City of Chicago wins this case and the Village of Arlington Heights its case—it could be held up for a monopoly toll, as if Illinois's municipalities were so many little medieval German principalities. Heinrich von Kleist, *Michael Kohlhaas* (1810). This hold-up potential is the principal argument for investing right of way companies with the power of eminent domain, but they cannot exercise that power against municipalities.

So not only has the City failed to show irreparable harm, it has failed to show that its claim against ATS has any merit, although the latter conclusion must remain tentative until the Supreme Court of Illinois decides the *Arlington Heights* case. We therefore direct the district court to vacate the preliminary injunction, to stay further proceedings until the decision by the supreme court, and then to proceed in conformity with the principles set forth in this opinion and that of the supreme court—with due regard for the fact that the Illinois supreme court's view of Illinois law prevails over ours in the event of conflict.

REVERSED, AND REMANDED WITH DIRECTIONS.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I concur in that part of the judgment and opinion of the court that holds that the previous judgment in *Western Union Corp. v. Parrish*, No. 88 Ch. 9963 (Ill.Cir. Ct.), does not bar ATS from defending on the merits against the City's cross-claim in this suit. I respectfully dissent, however, from the remainder of the court's disposition of this case. In my view, we ought to

certify to the Illinois Supreme Court the issues of whether ATS is a telephone company and of whether Chicago's power to regulate ATS' activity is circumscribed by the Telephone and Telegraph Act.

No one can doubt that we have the *power* to decide this case. Diversity jurisdiction, both as a constitutional and statutory matter, grants us the authority. The question is whether we ought to use that power at this time despite the availability of other mechanisms that can be invoked easily, and that would permit the Illinois Supreme Court to decide these issues in a comprehensive and coherent manner.

At the outset, we should note the magnitude and importance of the task that confronts the Illinois Supreme Court in *Arlington Heights*. The court must attempt to apply a regulatory statute of relatively ancient vintage to one of the most technologically progressive and innovative industries in the United States. That task will involve no doubt far more than the rote application of settled legal principles to a set of facts. Rather, as the majority opinion amply demonstrates, it involves the subtle process of filling the interstices of the statutory scheme to deal with technological developments never envisioned by those who set in place the regulatory scheme. Such a policy-oriented task requires a familiarity with—and an appreciation of—the entire state regulatory scheme. The Illinois Supreme Court, not a panel of this court, ought to determine whether Illinois public policy, as embodied in the pronouncements of its legislature, permits the state's municipalities to regard modern fiber optic technology as a revenue source and, if so, under what circumstances. Perhaps the justices will agree with my brothers that such a course would amount to a "monopoly toll" that would transform Illinois municipalities to the level of "so many little medieval German principalities." Majority Op. at 1400. However, that assessment should come, if at all possible, from the pen of a justice of the Illinois Supreme Court, not that of a judge of this court.

As the majority notes, there are no doubt times when, despite considerations that make state court adjudication the preferable course, it would be necessary for the federal court to decide the state law issues in this case. Here, however, the state alternative is readily available. The principal issue is already before the State Supreme Court. The other issue—whether ATS is a telephone company—is hardly so fact-specific as to constitute an imposition on the time of the justices of that court. The relevant facts are that ATS has general articles of incorporation and registered with the secretary of state as a foreign corporation intending to do "telecommunications" business. The district court and the City are of the view that a company must have a certificate of public convenience and necessity in order to qualify as a telephone company. A pure matter of statutory construction is presented. Furthermore, the applicability of the Telephone Act to modern participants in the telecommunications industry is hardly an issue unworthy of the state court's time. Indeed, it is an important aspect of the state's regulatory scheme. Certification of both these issues will afford the Illinois Supreme Court the opportunity to clarify comprehensively the regulatory scheme without the danger of conflicting or differently nuanced pronouncements.

The futility of the court's forging on to decision despite the pending proceedings in the Illinois Supreme Court is evident on the face of its opinion. It is selective in those state law issues it addresses; it pointedly declines to deal with the applicability of the ten-day privilege of the Telephone Act to cities like Chicago. Majority Op. at 1398–99. Indeed it admits, quite frankly, that its views on the content of state law are tentative because of the pendency of *Arlington Heights* in the Illinois Supreme Court. Majority Op. at 1400. Under these circumstances, one must speculate as to the purpose of this gratuitous pronouncement. It is an unnecessary expenditure of the judicial resources of this court and deprives the Illinois Supreme Court of the opportunity to deal with this important problem comprehensively. A gratuitous effort to help

another court with its own law is hardly sufficient countervailing justification. Indeed, as the majority notes, there is sufficient secondary literature available to the justices should they care to consult it.

The best one might be able to say about this effort to counsel the Illinois Supreme Court is that it "could do no harm." Majority Op. at 1395. However, even this justification is overly charitable. There is a significant harm, albeit an intangible one, when a federal appellate court ignores without good and sufficient reason an available mechanism that allows a state to declare the content of its own law. Indeed, preliminary injunction analysis requires that we include in our weighing of the "balance of harms" the "public good." That public good requires that we do something other than gratuitously express a preference for a free market solution to a complex municipal regulatory problem. It requires that we give respectful heed to the prerogatives of the state courts to determine definitively the content of state law.

These views, my brothers suggest, represent an unwarranted timidity. Majority Op. at 1395. There is a great difference between timidity and respectfulness—not only for the content of state law but also for the prerogative of state judicial officers to determine the content of state law. Illinois has invited us by statute to refer certified questions to its Supreme Court, not to file an amicus brief. If respecting the limits on that invitation is timidity, let us make the most of it.[1]

---

**1.** My brothers contend that we ought not be "shy" about stating the content of state law. Majority Op. at 1395. I respectfully submit that there is another shyness manifest in this case—a shyness about certifying issues to the Illinois Supreme Court. Indeed, when one reviews this court's chronic underutilization of this statute, it is difficult not to conclude that, as a court, we suffer from an institutional shyness in this regard. The reasons for this reluctance appear enshrouded in a murky conventional wisdom, largely of an anecdotal nature, that is hardly a sound basis for principled decision-making. It is time that, as a court, we undertook some "assertiveness training" in this regard. We do the justices of the Supreme Court of Illinois a great injustice if we assume that they do not want to take responsibility for the elucidation of Illinois law.